## SCHNECKLOTH, CONSERVATION CENTER SUPERINTENDENT *v.* BUSTAMONTE

No. 71–732.   Argued October 10, 1972—Decided May 29, 1973

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. BLACKMUN, J., filed a concurring opinion, *post,* p. 249.   POWELL, J., filed a concurring opinion, in which BURGER, C. J., and REHNQUIST, J., joined, *post,* p. 250.   DOUGLAS, J., *post,* p. 275, BRENNAN, J., *post,* p. 276, and MARSHALL, J., *post,* p. 277, filed dissenting opinions.

*Robert R. Granucci,* Deputy Attorney General of California, argued the cause for petitioner.   With him on the briefs were *Evelle J. Younger,* Attorney General, *Herbert L. Ashby,* Chief Assistant Attorney General, *Doris H. Maier,* Assistant Attorney General, and *Edward P. O'Brien,* Deputy Attorney General

*Stuart P. Tobisman,* by appointment of the Court,

405 U. S. 1062, argued the cause and filed a brief for respondent *pro hac vice.**

MR. JUSTICE STEWART delivered the opinion of the Court.

It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is *"per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *Katz* v. *United States,* 389 U. S. 347, 357; *Coolidge* v. *New Hampshire,* 403 U. S. 443, 454–455; *Chambers* v. *Maroney,* 399 U. S. 42, 51. It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent. *Davis* v. *United States,* 328 U. S. 582, 593–594; *Zap* v. *United States,* 328 U. S. 624, 630. The constitutional question in the present case concerns the definition of "consent" in this Fourth and Fourteenth Amendment context.

I

The respondent was brought to trial in a California court upon a charge of possessing a check with intent to defraud.[1] He moved to suppress the introduction of certain material as evidence against him on the ground that the material had been acquired through an unconstitutional search and seizure. In response to the motion, the trial judge conducted an evidentiary hearing

---

*William J. Scott,* Attorney General, and *James B. Zagel* and *Jayne A. Carr,* Assistant Attorneys General, filed a brief for the State of Illinois et al. as *amici curiae* urging reversal.

*Melvin L. Wulf, Sanford J. Rosen, Joel M. Gora, A. L. Wirin, Fred Okrand,* and *Lawrence R. Sperber* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance.

[1] Cal. Penal Code § 475a.

where it was established that the material in question had been acquired by the State under the following circumstances:

While on routine patrol in Sunnyvale, California, at approximately 2:40 in the morning, Police Officer James Rand stopped an automobile when he observed that one headlight and its license plate light were burned out. Six men were in the vehicle. Joe Alcala and the respondent, Robert Bustamonte, were in the front seat with Joe Gonzales, the driver. Three older men were seated in the rear. When, in response to the policeman's question, Gonzales could not produce a driver's license, Officer Rand asked if any of the other five had any evidence of identification. Only Alcala produced a license, and he explained that the car was his brother's. After the six occupants had stepped out of the car at the officer's request and after two additional policemen had arrived, Officer Rand asked Alcala if he could search the car. Alcala replied, "Sure, go ahead." Prior to the search no one was threatened with arrest and, according to Officer Rand's uncontradicted testimony, it "was all very congenial at this time." Gonzales testified that Alcala actually helped in the search of the car, by opening the trunk and glove compartment. In Gonzales' words: "[T]he police officer asked Joe [Alcala], he goes, 'Does the trunk open?' And Joe said, 'Yes.' He went to the car and got the keys and opened up the trunk." Wadded up under the left rear seat, the police officers found three checks that had previously been stolen from a car wash.

The trial judge denied the motion to suppress, and the checks in question were admitted in evidence at Bustamonte's trial. On the basis of this and other evidence he was convicted, and the California Court of Appeal for the First Appellate District affirmed the convic-

tion. 270 Cal. App. 2d 648, 76 Cal. Rptr. 17. In agreeing that the search and seizure were constitutionally valid, the appellate court applied the standard earlier formulated by the Supreme Court of California in an opinion by then Justice Traynor: "Whether in a particular case an apparent consent was in fact voluntarily given or was in submission to an express or implied assertion of authority, is a question of fact to be determined in the light of all the circumstances." *People* v. *Michael*, 45 Cal. 2d 751, 753, 290 P. 2d 852, 854. The appellate court found that "[i]n the instant case the prosecution met the necessary burden of showing consent . . . since there were clearly circumstances from which the trial court could ascertain that consent had been freely given without coercion or submission to authority. Not only officer Rand, but Gonzales, the driver of the automobile, testified that Alcala's assent to the search of his brother's automobile was freely, even casually given. At the time of the request to search the automobile the atmosphere, according to Rand, was 'congenial' and there had been no discussion of any crime. As noted, Gonzales said Alcala even attempted to aid in the search." 270 Cal. App. 2d, at 652, 76 Cal. Rptr., at 20. The California Supreme Court denied review.[2]

Thereafter, the respondent sought a writ of habeas corpus in a federal district court. It was denied.[3] On appeal, the Court of Appeals for the Ninth Circuit, relying on its prior decisions in *Cipres* v. *United States,* 343 F. 2d 95, and *Schoepflin* v. *United States,* 391 F. 2d 390, set aside the District Court's order. 448 F. 2d 699. The appellate court reasoned that a consent was a waiver of a person's Fourth and Fourteenth Amendment rights, and that the State was under an obligation to demon-

---

[2] The order of the California Supreme Court is unreported.

[3] The decision of the District Court is unreported.

strate, not only that the consent had been uncoerced, but that it had been given with an understanding that it could be freely and effectively withheld. Consent could not be found, the court held, solely from the absence of coercion and a verbal expression of assent. Since the District Court had not determined that Alcala had *known* that his consent could have been withheld and that he could have refused to have his vehicle searched, the Court of Appeals vacated the order denying the writ and remanded the case for further proceedings. We granted certiorari to determine whether the Fourth and Fourteenth Amendments require the showing thought necessary by the Court of Appeals. 405 U. S. 953.

## II

It is important to make it clear at the outset what is not involved in this case. The respondent concedes that a search conducted pursuant to a valid consent is constitutionally permissible. In *Katz* v. *United States,* 389 U. S., at 358, and more recently in *Vale* v. *Louisiana,* 399 U. S. 30, 35, we recognized that a search authorized by consent is wholly valid. See also *Davis* v. *United States,* 328 U. S., at 593–594; *Zap* v. *United States,* 328 U. S., at 630.[4] And similarly the State concedes that "[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given'." *Bumper* v. *North Carolina,* 391 U. S. 543, 548. See also *Johnson* v. *United States,* 333 U. S. 10; *Amos* v. *United States,* 255 U. S. 313.

---

[4] "One would expect a hard-headed system like the common law to recognize exceptions even to the most comprehensive principle for safeguarding liberty. This is true of the prohibition of all searches and seizures as unreasonable unless authorized by a judicial warrant appropriately supported." *Davis* v. *United States,* 328 U. S. 582, 609 (Frankfurter, J., dissenting).

The precise question in this case, then, is what must the prosecution prove to demonstrate that a consent was "voluntarily" given. And upon that question there is a square conflict of views between the state and federal courts that have reviewed the search involved in the case before us. The Court of Appeals for the Ninth Circuit concluded that it is an essential part of the State's initial burden to prove that a person knows he has a right to refuse consent. The California courts have followed the rule that voluntariness is a question of fact to be determined from the totality of all the circumstances, and that the state of a defendant's knowledge is only one factor to be taken into account in assessing the voluntariness of a consent. See, e. g., *People* v. *Tremayne*, 20 Cal. App. 3d 1006, 98 Cal. Rptr. 193; *People* v. *Roberts*, 246 Cal. App. 2d 715, 55 Cal. Rptr. 62.

A

The most extensive judicial exposition of the meaning of "voluntariness" has been developed in those cases in which the Court has had to determine the "voluntariness" of a defendant's confession for purposes of the Fourteenth Amendment. Almost 40 years ago, in *Brown* v. *Mississippi*, 297 U. S. 278, the Court held that a criminal conviction based upon a confession obtained by brutality and violence was constitutionally invalid under the Due Process Clause of the Fourteenth Amendment. In some 30 different cases decided during the era that intervened between *Brown* and *Escobedo* v. *Illinois*, 378 U. S. 478, the Court was faced with the necessity of determining whether in fact the confessions in issue had been "voluntarily" given.[5] It is to that body

---

[5] See *Miranda* v. *Arizona*, 384 U. S. 436, 507, and n. 3 (Harlan, J., dissenting); *Spano* v. *New York*, 360 U. S. 315, 321 n. 2 (citing 28 cases).

of case law to which we turn for initial guidance on the meaning of "voluntariness" in the present context.[6]

Those cases yield no talismanic definition of "voluntariness," mechanically applicable to the host of situations where the question has arisen. "The notion of 'voluntariness,' " Mr. Justice Frankfurter once wrote, "is itself an amphibian." *Culombe* v. *Connecticut*, 367 U. S. 568, 604–605. It cannot be taken literally to mean a "knowing" choice. "Except where a person is unconscious or drugged or otherwise lacks capacity for conscious choice, all incriminating statements—even those made under brutal treatment—are 'voluntary' in the sense of representing a choice of alternatives. On the other hand, if 'voluntariness' incorporates notions of 'but-for' cause, the question should be whether the statement would have been made even absent inquiry or other official action. Under such a test, virtually no statement would be voluntary because very few people give incriminating statements in the absence of official action of some kind." [7] It is thus evident that neither linguistics nor epistemology will provide a ready definition of the meaning of "voluntariness."

Rather, "voluntariness" has reflected an accommodation of the complex of values implicated in police ques-

---

[6] Similarly, when we recently considered the meaning of a "voluntary" guilty plea, we returned to the standards of "voluntariness" developed in the coerced-confession cases. See *Brady* v. *United States*, 397 U. S. 742, 749. See also n. 25, *infra*.

[7] Bator & Vorenberg, Arrest, Detention, Interrogation and the Right to Counsel: Basic Problems and Possible Legislative Solutions, 66 Col. L. Rev. 62, 72–73. See also 3 J. Wigmore, Evidence § 826 (J. Chadbourn rev. 1970): "When, for example threats are used, the situation is one of choice between alternatives, either one disagreeable, to be sure, but still subject to a choice. As between the rack and a confession, the latter would usually be considered the less disagreeable; but it is nonetheless a voluntary choice."

tioning of a suspect.  At one end of the spectrum is the acknowledged need for police questioning as a tool for the effective enforcement of criminal laws.  See *Culombe* v. *Connecticut, supra,* at 578–580.  Without such investigation, those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved.  In short, the security of all would be diminished.  *Haynes* v. *Washington,* 373 U. S. 503, 515.  At the other end of the spectrum is the set of values reflecting society's deeply felt belief that the criminal law cannot be used as an instrument of unfairness, and that the possibility of unfair and even brutal police tactics poses a real and serious threat to civilized notions of justice.  "[I]n cases involving involuntary confessions, this Court enforces the strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will."  *Blackburn* v. *Alabama,* 361 U. S. 199, 206–207.  See also *Culombe* v. *Connecticut, supra,* at 581–584; *Chambers* v. *Florida,* 309 U. S. 227, 235–238.

This Court's decisions reflect a frank recognition that the Constitution requires the sacrifice of neither security nor liberty.  The Due Process Clause does not mandate that the police forgo all questioning, or that they be given carte blanche to extract what they can from a suspect.  "The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker?  If it is, if he has willed to confess, it may be used against him.  If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his

confession offends due process." *Culombe* v. *Connecticut, supra,* at 602.

In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused, *e. g., Haley* v. *Ohio,* 332 U. S. 596; his lack of education, *e. g., Payne* v. *Arkansas,* 356 U. S. 560; or his low intelligence, *e. g., Fikes* v. *Alabama,* 352 U. S. 191; the lack of any advice to the accused of his constitutional rights, *e. g., Davis* v. *North Carolina,* 384 U. S. 737; the length of detention, *e. g., Chambers* v. *Florida, supra;* the repeated and prolonged nature of the questioning, *e. g., Ashcraft* v. *Tennessee,* 322 U. S. 143; and the use of physical punishment such as the deprivation of food or sleep, *e. g., Reck* v. *Pate,* 367 U. S. 433.[8] In all of these cases, the Court determined the factual circumstances surrounding the confession, assessed the psychological impact on the accused, and evaluated the legal significance of how the accused reacted. *Culombe* v. *Connecticut, supra,* at 603.

The significant fact about all of these decisions is that none of them turned on the presence or absence of a single controlling criterion; each reflected a careful scrutiny of all the surrounding circumstances. See *Miranda* v. *Arizona,* 384 U. S. 436, 508 (Harlan, J., dissenting); *id.,* at 534–535 (WHITE, J., dissenting). In none of them did the Court rule that the Due Process Clause required the prosecution to prove as part of its

---

[8] See generally *Miranda* v. *Arizona,* 384 U. S., at 508 (Harlan, J., dissenting); 3 J. Wigmore, Evidence § 826 (J. Chadbourn rev. 1970); Note, Developments in the Law: Confessions, 79 Harv. L. Rev. 938, 954–984.

initial burden that the defendant knew he had a right to refuse to answer the questions that were put. While the state of the accused's mind, and the failure of the police to advise the accused of his rights, were certainly factors to be evaluated in assessing the "voluntariness" of an accused's responses, they were not in and of themselves determinative. See, e. g., *Davis* v. *North Carolina, supra; Haynes* v. *Washington, supra,* at 510–511; *Culombe* v. *Connecticut, supra,* at 610; *Turner* v. *Pennsylvania,* 338 U. S. 62, 64.

## B

Similar considerations lead us to agree with the courts of California that the question whether a consent to a search was in fact "voluntary" or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent. As with police questioning, two competing concerns must be accommodated in determining the meaning of a "voluntary" consent—the legitimate need for such searches and the equally important requirement of assuring the absence of coercion.

In situations where the police have some evidence of illicit activity, but lack probable cause to arrest or search, a search authorized by a valid consent may be the only means of obtaining important and reliable evidence.[9] In the present case for example, while the police had reason to stop the car for traffic violations, the State does not contend that there was probable cause to search the vehicle or that the search was incident to a valid arrest

---

[9] See Note, Consent Searches: A Reappraisal After Miranda v. Arizona, 67 Col. L. Rev. 130, 130–131.

of any of the occupants.[10]   Yet, the search yielded tangible evidence that served as a basis for a prosecution, and provided some assurance that others, wholly innocent of the crime, were not mistakenly brought to trial.   And in those cases where there is probable cause to arrest or search, but where the police lack a warrant, a consent search may still be valuable.   If the search is conducted and proves fruitless, that in itself may convince the police that an arrest with its possible stigma and embarrassment is unnecessary, or that a far more extensive search pursuant to a warrant is not justified.   In short, a search pursuant to consent may result in considerably less inconvenience for the subject of the search, and, properly conducted, is a constitutionally permissible and wholly legitimate aspect of effective police activity.

But the Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force.   For, no matter how subtly the coercion was applied, the resulting "consent" would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed.   In the words of the classic admonition in *Boyd* v. *United States,* 116 U. S. 616, 635:

> "It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure.   This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed.   A close

---

[10] If there had been probable cause for the search of the automobile, a search warrant would not have been necessary in this case. See *Brinegar* v. *United States,* 338 U. S. 160; *Carroll* v. *United States,* 267 U. S. 132.

and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon."

The problem of reconciling the recognized legitimacy of consent searches with the requirement that they be free from any aspect of official coercion cannot be resolved by any infallible touchstone. To approve such searches without the most careful scrutiny would sanction the possibility of official coercion; to place artificial restrictions upon such searches would jeopardize their basic validity. Just as was true with confessions, the requirement of a "voluntary" consent reflects a fair accommodation of the constitutional requirements involved. In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents. Those searches that are the product of police coercion can thus be filtered out without undermining the continuing validity of consent searches. In sum, there is no reason for us to depart in the area of consent searches, from the traditional definition of "voluntariness."

The approach of the Court of Appeals for the Ninth Circuit finds no support in any of our decisions that have attempted to define the meaning of "voluntariness." Its ruling, that the State must affirmatively prove that the subject of the search knew that he had a right to refuse consent, would, in practice, create serious doubt whether consent searches could continue to be conducted. There might be rare cases where it could be proved from the record that a person in fact affirmatively knew of his

right to refuse—such as a case where he announced to the police that if he didn't sign the consent form, "you [police] are going to get a search warrant;"[11] or a case where by prior experience and training a person had clearly and convincingly demonstrated such knowledge.[12] But more commonly where there was no evidence of any coercion, explicit or implicit, the prosecution would nevertheless be unable to demonstrate that the subject of the search in fact had known of his right to refuse consent.

The very object of the inquiry—the nature of a person's subjective understanding—underlines the difficulty of the prosecution's burden under the rule applied by the Court of Appeals in this case. Any defendant who was the subject of a search authorized solely by his consent could effectively frustrate the introduction into evidence of the fruits of that search by simply failing to testify that he in fact knew he could refuse to consent. And the near impossibility of meeting this prosecutorial burden suggests why this Court has never accepted any such litmus-paper test of voluntariness. It is instructive to recall the fears of then Justice Traynor of the California Supreme Court:

> "[I]t is not unreasonable for officers to seek interviews with suspects or witnesses or to call upon them at their homes for such purposes. Such inquiries, although courteously made and not accompanied with any assertion of a right to enter or search or secure answers, would permit the criminal to defeat his prosecution by voluntarily revealing all of the evidence against him and then contending that he acted only in response to an implied assertion of

[11] *United States* v. *Curiale*, 414 F. 2d 744, 747.
[12] Cf. *Rosenthall* v. *Henderson*, 389 F. 2d 514, 516.

unlawful authority." *People* v. *Michael,* 45 Cal. 2d, at 754, 290 P. 2d, at 854.

One alternative that would go far toward proving that the subject of a search did know he had a right to refuse consent would be to advise him of that right before eliciting his consent. That, however, is a suggestion that has been almost universally repudiated by both federal [13] and state courts,[14] and, we think, rightly so. For it would be thoroughly impractical to impose on the normal consent search the detailed requirements of an effective warning. Consent searches are part of the standard investigatory techniques of law enforcement

---

[13] See, *e. g., Gorman* v. *United States,* 380 F. 2d 158, 164 (CA1); *United States ex rel. Cole* v. *Mancusi,* 429 F. 2d 61, 66 (CA2); *United States ex rel. Harris* v. *Hendricks,* 423 F. 2d 1096, 1101 (CA3); *United States* v. *Vickers,* 387 F. 2d 703, 707 (CA4); *United States* v. *Goosbey,* 419 F. 2d 818 (CA6); *United States* v. *Noa,* 443 F. 2d 144, 147 (CA9); *Leeper* v. *United States,* 446 F. 2d 281, 284 (CA10). But see, *United States* v. *Nikrasch,* 367 F. 2d 740, 744 (CA7); *United States* v. *Moderacki,* 280 F. Supp. 633 (Del.); *United States* v. *Blalock,* 255 F. Supp. 268 (ED Pa.). While there is dictum in *Nikrasch* to the effect that warnings are necessary for an effective Fourth Amendment consent, the Court of Appeals for the Seventh Circuit subsequently recanted that position and termed it "of dubious propriety." *Byrd* v. *Lane,* 398 F. 2d 750, 755. The Court of Appeals limited *Nikrasch* to its facts—a case where a suspect arrested on a disorderly conduct charge and incarcerated for eight hours "consented" from his jail cell to a search of his car.

[14] See, *e. g., People* v. *Roberts,* 246 Cal. App. 2d 715, 55 Cal. Rptr. 62; *People* v. *Dahlke,* 257 Cal. App. 2d 82, 64 Cal. Rptr. 599; *State* v. *Custer,* 251 So. 2d 287 (Fla. App.); *State* v. *Oldham,* 92 Idaho 124, 438 P. 2d 275; *State* v. *McCarty,* 199 Kan. 116, 427 P. 2d 616, vacated in part on other grounds, 392 U. S. 308; *Hohnke* v. *Commonwealth,* 451 S. W. 2d 162 (Ky.); *State* v. *Andrus,* 250 La. 765, 199 So. 2d 867; *Morgan* v. *State,* 2 Md. App. 440, 234 A. 2d 762; *State* v. *Witherspoon,* 460 S. W. 2d 281 (Mo.); *State* v. *Forney,* 181 Neb. 757, 150 N. W. 2d 915; *State* v. *Douglas,* 260 Ore. 60, 488 P. 2d 1366.

agencies. They normally occur on the highway, or in a person's home or office, and under informal and unstructured conditions. The circumstances that prompt the initial request to search may develop quickly or be a logical extension of investigative police questioning. The police may seek to investigate further suspicious circumstances or to follow up leads developed in questioning persons at the scene of a crime. These situations are a far cry from the structured atmosphere of a trial where, assisted by counsel if he chooses, a defendant is informed of his trial rights. Cf. *Boykin* v. *Alabama*, 395 U. S. 238, 243. And, while surely a closer question, these situations are still immeasurably far removed from "custodial interrogation" where, in *Miranda* v. *Arizona, supra,* we found that the Constitution required certain now familiar warnings as a prerequisite to police interrogation. Indeed, in language applicable to the typical consent search, we refused to extend the need for warnings:

> "Our decision is not intended to hamper the traditional function of police officers in investigating crime. . . . When an individual is in custody on probable cause, the police may, of course, seek out evidence in the field to be used at trial against him. Such investigation may include inquiry of persons not under restraint. General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement." 384 U. S., at 477–478.

Consequently, we cannot accept the position of the Court of Appeals in this case that proof of knowledge of the right to refuse consent is a necessary prerequisite

to demonstrating a "voluntary" consent. Rather, it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced. It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches.

For example, in *Davis* v. *United States*, 328 U. S. 582, federal agents enforcing wartime gasoline-rationing regulations, arrested a filling station operator and asked to see his rationing coupons. He eventually unlocked a room where the agents discovered the coupons that formed the basis for his conviction. The District Court found that the petitioner had consented to the search—that although he had at first refused to turn the coupons over, he had soon been persuaded to do so and that force or threat of force had not been employed to persuade him. Concluding that it could not be said that this finding was erroneous, this Court, in an opinion by MR. JUSTICE DOUGLAS that looked to all the circumstances surrounding the consent, affirmed the judgment of conviction: "The public character of the property, the fact that the demand was made during business hours at the place of business where the coupons were required to be kept, the existence of the right to inspect, the nature of the request, the fact that the initial refusal to turn the coupons over was soon followed by acquiescence in the demand—these circumstances all support the conclusion of the District Court." *Id.*, at 593–594. See also *Zap* v. *United States*, 328 U. S. 624.

Conversely, if under all the circumstances it has appeared that the consent was not given voluntarily—that it was coerced by threats or force, or granted only in submission to a claim of lawful authority—then we have found the consent invalid and the search unreasonable. See, *e. g.*, *Bumper* v. *North Carolina*, 391 U. S., at 548–549; *Johnson* v. *United States*, 333 U. S. 10; *Amos* v.

*United States,* 255 U. S. 313. In *Bumper,* a 66-year-old Negro widow, who lived in a house located in a rural area at the end of an isolated mile-long dirt road, allowed four white law enforcement officials to search her home after they asserted they had a warrant to search the house. We held the alleged consent to be invalid, noting that "[w]hen a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent." 391 U. S., at 550.

Implicit in all of these cases is the recognition that knowledge of a right to refuse is not a prerequisite of a voluntary consent. If the prosecution were required to demonstrate such knowledge, *Davis* and *Zap* could not have found consent without evidence of that knowledge. And similarly if the failure to prove such knowledge were sufficient to show an ineffective consent, the *Amos, Johnson,* and *Bumper* opinions would surely have focused upon the subjective mental state of the person who consented. Yet they did not.

In short, neither this Court's prior cases, nor the traditional definition of "voluntariness" requires proof of knowledge of a right to refuse as the *sine qua non* of an effective consent to a search.[15]

---

[15] This view is bolstered by *Coolidge* v. *New Hampshire,* 403 U. S. 443. There the Court determined that a suspect's wife was not operating as an agent of the State when she handed over her husband's guns and clothing to the police. We found nothing constitutionally suspect in the subjective forces that impelled the spouse to cooperate with the police. "Among these are the simple but often powerful convention of openness and honesty, the fear that secretive behavior will intensify suspicion, and uncertainty as to what course is most likely to be helpful to the absent spouse." *Id.,* at 488. "The test . . . is whether Mrs. Coolidge, in light of all

## C

It is said, however, that a "consent" is a "waiver" of a person's rights under the Fourth and Fourteenth Amendments. The argument is that by allowing the police to conduct a search, a person "waives" whatever right he had to prevent the police from searching. It is argued that under the doctrine of *Johnson* v. *Zerbst,* 304 U. S. 458, 464, to establish such a "waiver" the State must demonstrate "an intentional relinquishment or abandonment of a known right or privilege."

But these standards were enunciated in *Johnson* in the context of the safeguards of a fair criminal trial. Our cases do not reflect an uncritical demand for a knowing and intelligent waiver in every situation where a person has failed to invoke a constitutional protection. As Mr. Justice Black once observed for the Court: " 'Waiver' is a vague term used for a great variety of purposes, good and bad, in the law." *Green* v. *United States,* 355 U. S. 184, 191. With respect to procedural due process, for example, the Court has acknowledged that waiver is possible, while explicitly leaving open the question whether a "knowing and intelligent" waiver need be shown.[16] See *D. H. Overmyer Co.* v. *Frick Co.,*

---

the circumstances of the case, must be regarded as having acted as an 'instrument' or agent of the state when she produced her husband's belongings." *Id.,* at 487.

Just as it was necessary in *Coolidge* to analyze the totality of the surrounding circumstances to assess the validity of Mrs. Coolidge's offer of evidence, it is equally necessary to assess all the circumstances surrounding a search where consent is obtained in response to an initial police question.

[16] *Johnson* v. *Zerbst,* 304 U. S. 458, itself relied on three civil cases, but none of those cases established the proposition that a waiver, to be effective, must be knowing and intelligent. *Hodges* v. *Easton,* 106 U. S. 408, which concerned the waiver of a civil jury trial by the submission of a special verdict to the jury, indicates only that "every

405 U. S. 174, 185–186; *Fuentes* v. *Shevin*, 407 U. S. 67, 94–96.[17]

The requirement of a "knowing" and "intelligent" waiver was articulated in a case involving the validity of a defendant's decision to forgo a right constitutionally guaranteed to protect a fair trial and the reliability of the truth-determining process. *Johnson* v. *Zerbst, supra,* dealt with the denial of counsel in a federal criminal trial. There the Court held that under the Sixth Amendment a criminal defendant is entitled to the assistance of counsel, and that if he lacks sufficient funds to retain counsel, it is the Government's obligation to furnish him with a lawyer. As Mr. Justice Black wrote for the Court: "The Sixth Amendment stands as a constant admonition that if the constitutional safeguards it provides be lost, justice will not 'still be done.' It embodies a realistic recognition of the obvious truth that the average defendant does not have the professional legal skill to protect himself when brought before a tribunal with power to take his life or liberty, wherein the prosecution is presented by experienced and learned counsel. That which is simple, orderly and necessary to the lawyer, to the untrained layman may appear intricate, complex and mysterious." 304 U. S., at 462–463 (footnote omitted). To preserve the fairness of the trial process the Court established an appropriately heavy burden on the Government before waiver could be found—"an in-

reasonable presumption should be indulged against . . . waiver." *Id.,* at 412. *Aetna Ins. Co.* v. *Kennedy,* 301 U. S. 389, is to the same effect. *Ohio Bell Tel. Co.* v. *Public Utilities Comm'n,* 301 U. S. 292, which involved the possible waiver of procedural due process rights, stands only for the proposition that: "We do not presume acquiescence in the loss of fundamental rights." *Id.,* at 307.

[17] Cf. *Parden* v. *Terminal R. Co.,* 377 U. S. 184 (operation of common carrier railroad found to be waiver of State's sovereign immunity despite objection that there was no "waiver" under *Johnson*);

tentional relinquishment or abandonment of a known right or privilege." *Id.*, at 464.

Almost without exception, the requirement of a knowing and intelligent waiver has been applied only to those rights which the Constitution guarantees to a criminal defendant in order to preserve a fair trial.[18] Hence, and hardly surprisingly in view of the facts of *Johnson* itself, the standard of a knowing and intelligent waiver has most often been applied to test the validity of a waiver of counsel, either at trial,[19] or upon a guilty plea.[20] And the Court has also applied the *Johnson* criteria to assess the effectiveness of a waiver of other trial rights such as the right to confrontation,[21] to a jury trial,[22] and to a speedy trial,[23] and the right to be free from

---

*National Equipment Rental, Ltd.* v. *Szukhent*, 375 U. S. 311 (valid waiver of procedural due process found over objection of no compliance with *Johnson*). See also *Employees* v. *Missouri Public Health Dept.*, 411 U. S. 279, 296 (MARSHALL, J., concurring in result).

[18] One apparent exception was *Marchetti* v. *United States*, 390 U. S. 39, 51–52, where we found no meaningful waiver of the privilege against compulsory self-incrimination when a gambler was forced to pay a wagering tax. We reasoned that there could be no choice when the gambler was faced with the alternative of giving up gambling or providing incriminatory information. Analytically, therefore, although the Court cited *Johnson*, *Marchetti* turned on the lack of a "voluntary" waiver rather than the lack of any "knowing" and "intelligent" waiver.

[19] See, e. g., *Glasser* v. *United States*, 315 U. S. 60; *Adams* v. *United States ex rel. McCann*, 317 U. S. 269; *Carnley* v. *Cochran*, 369 U. S. 506; cf. *Chessman* v. *Teets*, 354 U. S. 156 (no waiver of counsel shown at settlement of state court record).

[20] See, e. g., *Von Moltke* v. *Gillies*, 332 U. S. 708; *Uveges* v. *Pennsylvania*, 335 U. S. 437; *Moore* v. *Michigan*, 355 U. S. 155; *Boyd* v. *Dutton*, 405 U. S. 1.

[21] See, e. g., *Brookhart* v. *Janis*, 384 U. S. 1; *Barber* v. *Page*, 390 U. S. 719.

[22] See, e. g., *Adams* v. *United States ex rel. McCann, supra.*

[23] See, e. g., *Barker* v. *Wingo*, 407 U. S. 514.

twice being placed in jeopardy.[24]   Guilty pleas have been carefully scrutinized to determine whether the accused knew and understood all the rights to which he would be entitled at trial, and that he had intentionally chosen to forgo them.[25]   And the Court has evaluated the knowing and intelligent nature of the waiver of trial rights in trial-type situations, such as the waiver of the privilege against compulsory self-incrimination before an administrative agency[26] or a congressional committee,[27] or the waiver of counsel in a juvenile proceeding.[28]

The guarantees afforded a criminal defendant at trial also protect him at certain stages before the actual trial, and any alleged waiver must meet the strict standard of an intentional relinquishment of a "known" right.   But the "trial" guarantees that have been applied to the "pre-

---

[24] See, e. g., Green v. United States, 355 U. S. 184.

[25] See, e. g., McCarthy v. United States, 394 U. S. 459; Boykin v. Alabama, 395 U. S. 238.

Our cases concerning the validity of guilty pleas underscore the fact that the question whether a person has acted "voluntarily" is quite distinct from the question whether he has "waived" a trial right.   The former question, as we made clear in Brady v. United States, 397 U. S., at 749, can be answered only by examining all the relevant circumstances to determine if he has been coerced.   The latter question turns on the extent of his knowledge.   We drew the same distinction in McMann v. Richardson, 397 U. S. 759, 766:

"A conviction after a plea of guilty normally rests on the defendant's own admission in open court that he committed the acts with which he is charged. . . .   That admission may not be compelled, and since the plea is also a waiver of trial—and unless the applicable law otherwise provides, a waiver of the right to contest the admissibility of any evidence the State might have offered against the defendant—it must be an intelligent act 'done with sufficient awareness of the relevant circumstances and likely consequences.'" (Footnote omitted.)

[26] See, e. g., Smith v. United States, 337 U. S. 137.

[27] See, e. g., Emspak v. United States, 349 U. S. 190.

[28] See In re Gault, 387 U. S. 1, 42.

trial" stage of the criminal process are similarly designed to protect the fairness of the trial itself.

Hence, in *United States* v. *Wade,* 388 U. S. 218, and *Gilbert* v. *California,* 388 U. S. 263, the Court held "that a post-indictment pretrial lineup at which the accused is exhibited to identifying witnesses is a critical stage of the criminal prosecution; that police conduct of such a lineup without notice to and in the absence of his counsel denies the accused his Sixth [and Fourteenth] Amendment right to counsel . . . ." *Id.,* at 272. Accordingly, the Court indicated that the standard of a knowing and intelligent waiver must be applied to test the waiver of counsel at such a lineup. See *United States* v. *Wade, supra,* at 237. The Court stressed the necessary interrelationship between the presence of counsel at a post-indictment lineup before trial and the protection of the trial process itself:

> "Insofar as the accused's conviction may rest on a courtroom identification in fact the fruit of a suspect pretrial identification which the accused is helpless to subject to effective scrutiny at trial, the accused is deprived of that right of cross-examination which is an essential safeguard to his right to confront the witnesses against him. *Pointer* v. *Texas,* 380 U. S. 400. And even though cross-examination is a precious safeguard to a fair trial, it cannot be viewed as an absolute assurance of accuracy and reliability. Thus in the present context, where so many variables and pitfalls exist, the first line of defense must be the prevention of unfairness and the lessening of the hazards of eyewitness identification at the lineup itself. The trial which might determine the accused's fate may well not be that in the courtroom but that at the pretrial confrontation, with the State aligned against the accused, the

witness the sole jury, and the accused unprotected against the overreaching, intentional or unintentional, and with little or no effective appeal from the judgment there rendered by the witness—'that's the man.' " *Id.*, at 235–236.

And in *Miranda* v. *Arizona,* 384 U. S. 436, the Court found that *custodial* interrogation by the police was inherently coercive, and consequently held that detailed warnings were required to protect the privilege against compulsory self-incrimination. The Court made it clear that the basis for decision was the need to protect the fairness of the trial itself:

> "That counsel is present when statements are taken from an individual during interrogation obviously enhances the integrity of the fact-finding processes in court. The presence of an attorney, and the warnings delivered to the individual, enable the defendant under otherwise compelling circumstances to tell his story without fear, effectively, and in a way that eliminates the evils in the interrogation process. Without the protections flowing from adequate warnings and the rights of counsel, 'all the careful safeguards erected around the giving of testimony, whether by an accused or any other witness, would become empty formalities in a procedure where the most compelling possible evidence of guilt, a confession, would have already been obtained at the unsupervised pleasure of the police.' " *Id.*, at 466.

The standards of *Johnson* were, therefore, found to be a necessary prerequisite to a finding of a valid waiver. See 384 U. S., at 475–479. Cf. *Escobedo* v. *Illinois,* 378 U. S., at 490 n. 14.[29]

---

[29] As we have already noted, *supra,* at 232, *Miranda* itself involved interrogation of a suspect detained in custody and did not

There is a vast difference between those rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment. Nothing, either in the purposes behind requiring a "knowing" and "intelligent" waiver of trial rights, or in the practical application of such a requirement suggests that it ought to be extended to the constitutional guarantee against unreasonable searches and seizures.

A strict standard of waiver has been applied to those rights guaranteed to a criminal defendant to insure that he will be accorded the greatest possible opportunity to utilize every facet of the constitutional model of a fair criminal trial. Any trial conducted in derogation of that model leaves open the possibility that the trial reached an unfair result precisely because all the protections specified in the Constitution were not provided. A prime example is the right to counsel. For without that right, a wholly innocent accused faces the real and substantial danger that simply because of his lack of legal expertise he may be convicted. As Mr. Justice Harlan once wrote: "The sound reason why [the right to counsel] is so freely extended for a criminal trial is the severe injustice risked by confronting an untrained defendant with a range of technical points of law, evidence, and tactics familiar to the prosecutor but not to

---

concern the investigatory procedures of the police in general on-the-scene questioning. 384 U. S., at 477.

By the same token, the present case does not require a determination of the proper standard to be applied in assessing the validity of a search authorized solely by an alleged consent that is obtained from a person after he has been placed in custody. We do note, however, that other courts have been particularly sensitive to the heightened possibilities for coercion when the "consent" to a search was given by a person in custody. See, e. g., Judd v. United States, 89 U. S. App. D. C. 64, 66, 190 F. 2d 649, 651; Channel v. United States, 285 F. 2d 217; Villano v. United States, 310 F. 2d 680, 684; United States v. Marrese, 336 F. 2d 501.

himself." *Miranda* v. *Arizona, supra,* at 514 (dissenting opinion). The Constitution requires that every effort be made to see to it that a defendant in a criminal case has not unknowingly relinquished the basic protections that the Framers thought indispensable to a fair trial.[30]

The protections of the Fourth Amendment are of a wholly different order, and have nothing whatever to do with promoting the fair ascertainment of truth at a criminal trial. Rather, as Mr. Justice Frankfurter's opinion for the Court put it in *Wolf* v. *Colorado,* 338 U. S. 25, 27, the Fourth Amendment protects the "security of one's privacy against arbitrary intrusion by the police . . . ." In declining to apply the exclusionary rule of *Mapp* v. *Ohio,* 367 U. S. 643, to convictions that had become final before rendition of that decision, the Court emphasized that "there is no likelihood of unreliability or coercion present in a search-and-seizure case," *Linkletter* v. *Walker,* 381 U. S. 618, 638. In *Linkletter,* the Court indicated that those cases that had been given retroactive effect went to "the fairness of the trial—the very integrity of the fact-finding process. Here . . . the fairness of the trial is not under attack." *Id.,* at 639. The Fourth Amendment "is not an adjunct to the ascertainment of truth." The guarantees of the Fourth Amendment stand "as a protection of quite different constitutional values—values reflecting the concern of our society for the right of each individual to be let alone. To recognize this is no more than to accord those values undiluted respect." *Tehan* v. *United States ex rel. Shott,* 382 U. S. 406, 416.

Nor can it even be said that a search, as opposed to an eventual trial, is somehow "unfair" if a person consents to a search. While the Fourth and Fourteenth

---

[30] "[In] the uniformly structured situation of the defendant whose case is formally called for plea or trial, where, with everything to be gained by the presence of counsel and no interest deserving con-

Amendments limit the circumstances under which the police can conduct a search, there is nothing constitutionally suspect in a person's voluntarily allowing a search. The actual conduct of the search may be precisely the same as if the police had obtained a warrant. And, unlike those constitutional guarantees that protect a defendant at trial, it cannot be said every reasonable presumption ought to be indulged against voluntary relinquishment. We have only recently stated: "[I]t is no part of the policy underlying the Fourth and Fourteenth Amendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals." *Coolidge* v. *New Hampshire,* 403 U. S., at 488. Rather, the community has a real interest in encouraging consent, for the resulting search may yield necessary evidence for the solution and prosecution of crime, evidence that may insure that a wholly innocent person is not wrongly charged with a criminal offense.

Those cases that have dealt with the application of the *Johnson* v. *Zerbst* rule make clear that it would be next to impossible to apply to a consent search the standard of "an intentional relinquishment or abandonment of a known right or privilege." [31] To be true to *Johnson*

---

sideration to be lost, an inflexible rule serves well." Friendly, The Bill of Rights as a Code of Criminal Procedure, 53 Calif. L. Rev. 929, 950.

[31] While we have occasionally referred to a consent search as a "waiver," we have never used that term to mean "an intentional relinquishment or abandonment of a known right or privilege." Hence, for example, in *Johnson* v. *United States,* 333 U. S. 10, this Court found the consent to be ineffective: "Entry to defendant's living quarters, which was the beginning of the search, was demanded under color of office. It was granted in submission to authority rather than as an understanding and intentional waiver of a constitutional right." *Id.,* at 13. While the Court spoke in terms of "waiver" it arrived at the conclusion that there had been no "waiver" from an analysis of the totality of the objective circumstances—not from the absence of any express indication of Johnson's knowledge

and its progeny, there must be examination into the knowing and understanding nature of the waiver, an examination that was designed for a trial judge in the structured atmosphere of a courtroom. As the Court expressed it in *Johnson*:

> "The constitutional right of an accused to be represented by counsel invokes, of itself, the protection of a trial court, in which the accused—whose life or liberty is at stake—is without counsel. This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused. While an accused may waive the right to counsel, whether there is a proper waiver should be clearly determined by the trial court, and it would be fitting and appropriate for that determination to appear upon the record." 304 U. S., at 465.[32]

---

of a right to refuse or the lack of explicit warnings. See also *Amos v. United States*, 255 U. S. 313.

[32] The Court was even more explicit in *Von Moltke* v. *Gillies*, 332 U. S., at 723–724:

"To discharge this duty [of assuring the intelligent nature of the waiver] properly in light of the strong presumption against waiver of the constitutional right to counsel, a judge must investigate as long and as thoroughly as the circumstances of the case before him demand. The fact that an accused may tell him that he is informed of his right to counsel and desires to waive this right does not automatically end the judge's responsibility. To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter. A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered."

It would be unrealistic to expect that in the informal, unstructured context of a consent search, a policeman, upon pain of tainting the evidence obtained, could make the detailed type of examination demanded by *Johnson*. And, if for this reason a diluted form of "waiver" were found acceptable, that would itself be ample recognition of the fact that there is no universal standard that must be applied in every situation where a person forgoes a constitutional right.[33]

Similarly, a "waiver" approach to consent searches would be thoroughly inconsistent with our decisions that have approved "third party consents." In *Coolidge* v. *New Hampshire,* 403 U. S., at 487–490, where a wife surrendered to the police guns and clothing belonging to her husband, we found nothing constitutionally impermissible in the admission of that evidence at trial since the wife had not been coerced. *Frazier* v. *Cupp,* 394 U. S. 731, 740, held that evidence seized from the defendant's duffel bag in a search authorized by his cousin's consent was admissible at trial. We found that the defendant had assumed the risk that his cousin, with whom he shared the bag, would allow the police to search it. See also *Abel* v. *United States,* 362 U. S. 217. And

---

[33] It seems clear that even a limited view of the demands of "an intentional relinquishment or abandonment of a known right or privilege" standard would inevitably lead to a requirement of detailed warnings before any consent search—a requirement all but universally rejected to date. See nn. 13 and 14, *supra.* As the Court stated in *Miranda* with respect to the privilege against compulsory self-incrimination: "[W]e will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given. Assessments of the knowledge the defendant possessed, based on information as to his age, education, intelligence, or prior contact with authorities, can never be more than speculation; a warning is a clearcut fact." *Miranda* v. *Arizona,* 384 U. S., at 468–469 (footnote omitted). See *United States* v. *Moderacki,* 280 F. Supp. 633; *United States* v. *Blalock,* 255 F. Supp. 268.

in *Hill* v. *California,* 401 U. S. 797, 802–805, we held that the police had validly seized evidence from the petitioner's apartment incident to the arrest of a third party, since the police had probable cause to arrest the petitioner and reasonably, though mistakenly, believed the man they had arrested was he. Yet it is inconceivable that the Constitution could countenance the waiver of a defendant's right to counsel by a third party, or that a waiver could be found because a trial judge reasonably, though mistakenly, believed a defendant had waived his right to plead not guilty.[34]

In short, there is nothing in the purposes or application of the waiver requirements of *Johnson* v. *Zerbst* that justifies, much less compels, the easy equation of a knowing waiver with a consent search. To make such an equation is to generalize from the broad rhetoric of some of our decisions, and to ignore the substance of the differing constitutional guarantees. We decline to follow what one judicial scholar has termed "the domino method of constitutional adjudication . . . wherein every explanatory statement in a previous opinion is made the basis for extension to a wholly different situation."[35]

## D

Much of what has already been said disposes of the argument that the Court's decision in the *Miranda* case requires the conclusion that knowledge of a right to refuse is an indispensable element of a valid consent. The considerations that informed the Court's holding in *Miranda* are simply inapplicable in the present case.

---

[34] Our decision today is, of course, concerned with what constitutes a valid consent, not who can consent. But, the constitutional validity of third-party consents demonstrates the fundamentally different nature of a consent search from the waiver of a trial right.

[35] Friendly, *supra,* n. 30, at 950.

In *Miranda* the Court found that the techniques of police questioning and the nature of custodial surroundings produce an inherently coercive situation. The Court concluded that "[u]nless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice." 384 U. S., at 458. And at another point the Court noted that "without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id.*, at 467.

In this case, there is no evidence of any inherently coercive tactics—either from the nature of the police questioning or the environment in which it took place. Indeed, since consent searches will normally occur on a person's own familiar territory, the specter of incommunicado police interrogation in some remote station house is simply inapposite.[36] There is no reason to believe, under circumstances such as are present here, that the response to a policeman's question is presumptively coerced; and there is, therefore, no reason to reject the traditional test for determining the voluntariness of a person's response. *Miranda,* of course, did not reach investigative questioning of a person not in custody, which is most directly analogous to the situation of a consent search, and it assuredly did not indicate that such questioning ought to be deemed inherently coercive. See *supra,* at 232.

It is also argued that the failure to require the Government to establish knowledge as a prerequisite to a valid

[36] As noted above, *supra,* n. 29, the present case does not require a determination of what effect custodial conditions might have on a search authorized solely by an alleged consent.

consent, will relegate the Fourth Amendment to the special province of "the sophisticated, the knowledgeable and the privileged." We cannot agree. The traditional definition of voluntariness we accept today has always taken into account evidence of minimal schooling, low intelligence, and the lack of any effective warnings to a person of his rights; and the voluntariness of any statement taken under those conditions has been carefully scrutinized to determine whether it was in fact voluntarily given.[37]

## E

Our decision today is a narrow one. We hold only that when the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact

---

[37] See, e. g., Clewis v. Texas, 386 U. S. 707; Culombe v. Connecticut, 367 U. S. 568; Reck v. Pate, 367 U. S. 433; Payne v. Arkansas, 356 U. S. 560; Fikes v. Alabama, 352 U. S. 191; Harris v. South Carolina, 338 U. S. 68; Haley v. Ohio, 332 U. S. 596.

MR. JUSTICE WHITE once answered a similar argument:

"The Court may be concerned with a narrower matter: the unknowing defendant who responds to police questioning because he mistakenly believes that he must and that his admissions will not be used against him. . . . The failure to inform an accused that he need not answer and that his answers may be used against him is very relevant indeed to whether the disclosures are compelled. Cases in this Court, to say the least, have never placed a premium on ignorance of constitutional rights. If an accused is told he must answer and does not know better, it would be very doubtful that the resulting admissions could be used against him. When the accused has not been informed of his rights at all the Court characteristically and properly looks very closely at the surrounding circumstances." Escobedo v. Illinois, 378 U. S. 478, 499 (WHITE, J., dissenting).

to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent.[38] Because the California court followed these principles in affirming the respondent's conviction, and because the Court of Appeals for the Ninth Circuit in remanding for an evidentiary hearing required more, its judgment must be reversed.

*It is so ordered.*

Mr. Justice Blackmun, concurring.

I join the Court's opinion and its judgment.

At the time *Kaufman* v. *United States,* 394 U. S. 217 (1969), was decided, I, as a member of the Court of Appeals (but not of its panel) whose order was there reversed, found myself in agreement with the views expressed by Mr. Justice Harlan, writing for himself and my Brother Stewart in dissent. *Id.,* at 242. My attitude has not changed in the four years that have passed since *Kaufman* was decided.

Although I agree with nearly all that Mr. Justice Powell has to say in his detailed and persuasive concurring opinion, *post,* p. 250, I refrain from joining it at this time because, as Mr. Justice Stewart's opinion reveals, it is not necessary to reconsider *Kaufman* in order to decide the present case.

---

[38] The State also urges us to hold that a violation of the exclusionary rule may not be raised by a state or federal prisoner in a collateral attack on his conviction, and thus asks us to overturn our contrary holdings in *Kaufman* v. *United States,* 394 U. S. 217; *Whiteley* v. *Warden,* 401 U. S. 560; *Harris* v. *Nelson,* 394 U. S. 286; and *Mancusi* v. *DeForte,* 392 U. S. 364. Since we have found no valid Fourth and Fourteenth Amendment claim in this case, we do not consider that question.

Mr. Justice Powell, with whom The Chief Justice and Mr. Justice Rehnquist join, concurring.

While I join the opinion of the Court, it does not address what seems to me the overriding issue briefed and argued in this case: the extent to which federal habeas corpus should be available to a state prisoner seeking to exclude evidence from an allegedly unlawful search and seizure. I would hold that federal collateral review of a state prisoner's Fourth Amendment claims—claims which rarely bear on innocence—should be confined solely to the question of whether the petitioner was provided a fair opportunity to raise and have adjudicated the question in state courts. In view of the importance of this issue to our system of criminal justice, I think it appropriate to express my views.

I

Although petitions for federal habeas corpus assert a wide variety of constitutional questions, we are concerned in this case only with a Fourth Amendment claim that an unlawful search occurred and that the state court erred in failing to exclude the evidence obtained therefrom. A divided court in *Kaufman* v. *United States,* 394 U. S. 217 (1969), held that collateral review of search-and-seizure claims was appropriate on motions filed by federal prisoners under 28 U. S. C. § 2255. Until *Kaufman,* a substantial majority of the federal courts of appeals had considered that claims of unlawful search and seizure " 'are not proper matters to be presented by a motion to vacate sentence under § 2255 . . . .' " *Id.,* at 220. The rationale of this view was fairly summarized by the Court:

"The denial of Fourth Amendment protection against unreasonable searches and seizures, the Gov-

ernment's argument runs, is of a different nature from denials of other constitutional rights which we have held subject to collateral attack by federal prisoners. For unlike a claim of denial of effective counsel or of violation of the privilege against self incrimination, as examples, a claim of illegal search and seizure does not impugn the integrity of the fact-finding process or challenge evidence as inherently unreliable; rather, the exclusion of illegally seized evidence is simply a prophylactic device intended generally to deter Fourth Amendment violations by law enforcement officers." *Id.*, at 224.

In rejecting this rationale, the Court noted that under prior decisions "the federal habeas remedy extends to state prisoners alleging that unconstitutionally obtained evidence was admitted against them at trial," [1] and concluded that there was no basis for restricting "access by federal prisoners with illegal search-and-seizure claims to federal collateral remedies, while placing no similar restriction on access by state prisoners." *Id.*, at 225–226. In short, on petition for habeas corpus or collateral review filed in a federal district court, whether by state prisoners under 28 U. S. C. § 2254 or federal prisoners under § 2255, the present rule is that Fourth Amendment claims may be asserted and the exclusionary rule must be applied in precisely the same manner as on direct review. Neither the history or purpose of habeas corpus, the desired prophylactic utility of the exclusionary rule as applied to Fourth Amendment claims, nor any sound reason relevant to the administration of criminal justice in our federal system justifies such a power.

---

[1] Cases cited as examples included *Mancusi* v. *DeForte,* 392 U. S. 364 (1968); *Carafas* v. *LaVallee,* 391 U. S. 234 (1968); *Warden* v. *Hayden,* 387 U. S. 294 (1967).

## II

The federal review involved in this Fourth Amendment case goes well beyond the traditional purpose of the writ of habeas corpus. Much of the present perception of habeas corpus stems from a revisionist view of the historic function that writ was meant to perform. The critical historical argument has focused on the nature of the writ at the time of its incorporation in our Constitution and at the time of the Habeas Corpus Act of 1867, the direct ancestor of contemporary habeas corpus statutes.[2] In *Fay* v. *Noia,* 372 U. S. 391, 426 (1963), the Court interpreted the writ's historic position as follows:

"At the time the privilege of the writ was written into the Federal Constitution it was settled that the writ lay to test any restraint contrary to fundamental law, which in England stemmed ultimately from Magna Charta but in this country was embodied in the written Constitution. Congress in 1867 sought to provide a federal forum for state prisoners having constitutional defenses by extending the habeas corpus powers of the federal courts to their constitutional maximum. Obedient to this purpose, we have consistently held that federal court

---

[2] The Act of Feb. 5, 1867, c. 28, § 1, 14 Stat. 385, provided that "the several courts of the United States . . . within their respective jurisdictions, in addition to the authority already conferred by law, shall have power to grant writs of habeas corpus in all cases where any person may be restrained of his or her liberty in violation of the constitution, or of any treaty or law of the United States . . . ."

Federal habeas review for those in state custody is now authorized by 28 U. S. C. § 2254 (a):

"The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."

jurisdiction is conferred by the allegation of an unconstitutional restraint and is not defeated by anything that may occur in the state court proceedings."

If this were a correct interpretation of the relevant history, the present wide scope accorded the writ would have arguable support, despite the impressive reasons to the contrary. But recent scholarship has cast grave doubt on *Fay*'s version of the writ's historic function.

It has been established that both the Framers of the Constitution and the authors of the 1867 Act expected that the scope of habeas corpus would be determined with reference to the writ's historic, common-law development.[3] Mr. Chief Justice Marshall early referred to the common-law conception of the writ in determining its constitutional and statutory scope, *Ex parte Bollman*, 4 Cranch 75, 93–94 (1807); *Ex parte Watkins*, 3 Pet. 193, 201–202 (1830), and Professor Oaks has noted that "when the 1867 Congress provided that persons restrained of their liberty in violation of the Constitution could obtain a writ of habeas corpus from a federal court, it undoubtedly intended—except to the extent the legislation provided otherwise—to incorporate the common-law uses and functions of this remedy."[4]

It thus becomes important to understand exactly what was the common-law scope of the writ both when embraced by our Constitution and incorporated into the Habeas Corpus Act of 1867. Two respected scholars have recently explored precisely these questions.[5] Their efforts

---

[3] Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv. L. Rev. 441, 466 (1963); Oaks, Legal History in the High Court—Habeas Corpus, 64 Mich. L. Rev. 451, 451–456 (1966).

[4] Oaks, *supra*, n. 3, at 452.

[5] Professor Paul M. Bator of Harvard Law School and Professor Dallin H. Oaks formerly of the University of Chicago School of Law. Citations to the relevant articles are in n. 3, *supra*.

have been both meticulous and revealing. Their conclusions differ significantly from those of the Court in *Fay* v. *Noia,* that habeas corpus traditionally has been available "to remedy any kind of governmental restraint contrary to fundamental law." 372 U. S., at 405.

The considerable evidence marshaled by these scholars need not be restated here. Professor Oaks makes a convincing case that under the common law of habeas corpus at the time of the adoption of the Constitution, "once a person had been convicted by a superior court of general jurisdiction, a court disposing of a habeas corpus petition could not go behind the conviction for any purpose other than to verify the formal jurisdiction of the committing court." [6] Certainly that was what Mr. Chief Justice Marshall understood when he stated:

> "This writ [habeas corpus] is, as has been said, in the nature of a writ of error which brings up the body of the prisoner with the cause of commitment. The court can undoubtedly inquire into the sufficiency of that cause; but if it be the judgment of a court of competent jurisdiction, especially a judgment withdrawn by law from the revision of this court, is not that judgment in itself sufficient cause? Can the court, upon this writ, look beyond the judgment, and re-examine the charges on which it was rendered. A judgment, in its nature, concludes the subject on which it is rendered, and pronounces the law of the case. The judgment of a court of record whose jurisdiction is final, is as conclusive on all the world as the judgment of this court would be. It is as conclusive on this court as it is on other courts. It puts an end to inquiry concerning the fact, by deciding it." *Ex parte Watkins,* 3 Pet., at 202–203.

---

[6] Oaks, *supra,* n. 3, at 468.

The respect shown under common law for the finality of the judgment of a committing court at the time of the Constitution and in the early 19th century did not, of course, explicitly contemplate the operation of habeas corpus in the context of federal-state relations. Federal habeas review for state prisoners was not available until passage of the Habeas Corpus Act of 1867. Yet there is no evidence that Congress intended that Act to jettison the respect theretofore shown by a reviewing court for prior judgments by a court of proper jurisdiction. The Act "received only the most perfunctory attention and consideration in the Congress; indeed, there were complaints that its effects could not be understood at all." [7] In fact, as Professor Bator notes, it would require overwhelming evidence, which simply is not present, to conclude that the 1867 Congress intended "to tear habeas corpus entirely out of the context of its historical meaning and scope and convert it into an ordinary writ of error with respect to all federal questions in all criminal cases." [8] Rather, the House Judiciary Committee when it reviewed the Act in 1884 understood that it was not "contemplated by its framers or . . . properly . . . construed to authorize the overthrow of the final judgments of the State courts of general jurisdiction, by the inferior Federal judges. . . ." [9]

Much, of course, has transpired since that first Habeas Corpus Act. See *Fay* v. *Noia,* 372 U. S., at 449–463 (Harlan, J., dissenting). The scope of federal habeas corpus for state prisoners has evolved from a quite limited inquiry into whether the committing state court had jurisdiction, *Andrews* v. *Swartz,* 156 U. S. 272 (1895); *In re*

---

[7] Bator, *supra,* n. 3, at 475–476.

[8] *Id.,* at 475.

[9] H. R. Rep. No. 730, 48th Cong., 1st Sess., 5 (1884), quoted in Bator, *supra,* n. 3, at 477.

*Moran,* 203 U. S. 96 (1906), to whether the applicant had been given an adequate opportunity in state court to raise his constitutional claims, *Frank* v. *Mangum,* 237 U. S. 309 (1915); and finally to actual redetermination in federal court of state court rulings on a wide variety of constitutional contentions, *Brown* v. *Allen,* 344 U. S. 443 (1953). No one would now suggest that this Court be imprisoned by every particular of habeas corpus as it existed in the late 18th and 19th centuries. But recognition of that reality does not liberate us from all historical restraint. The historical evidence demonstrates that the purposes of the writ, at the time of the adoption of the Constitution, were tempered by a due regard for the finality of the judgment of the committing court. This regard was maintained substantially intact when Congress, in the Habeas Corpus Act of 1867, first extended federal habeas review to the delicate interrelations of our dual court systems.

## III

Recent decisions, however, have tended to depreciate the importance of the finality of prior judgments in criminal cases. *Kaufman,* 394 U. S., at 228; *Sanders* v. *United States,* 373 U. S. 1, 8 (1963); *Fay, supra,* at 424. This trend may be a justifiable evolution of the use of habeas corpus where the one in state custody raises a constitutional claim bearing on his innocence. But the justification for disregarding the historic scope and function of the writ is measurably less apparent in the typical Fourth Amendment claim asserted on collateral attack. In this latter case, a convicted defendant is most often asking society to redetermine a matter with no bearing at all on the basic justice of his incarceration.

Habeas corpus indeed *should* provide the added assurance for a free society that no innocent man suffers an unconstitutional loss of liberty. The Court in *Fay* described

habeas corpus as a remedy for "whatever society deems to be intolerable restraints," and recognized that those to whom the writ should be granted "are persons whom society has grievously wronged and for whom belated liberation is little enough compensation." *Id.*, at 401–402, 441. The Court there acknowledged that the central reason for the writ lay in remedying injustice to the individual. Recent commentators have recognized the same core concept, one noting that "where *personal liberty* is involved, a democratic society . . . insists that it is less important to reach an unshakable decision than to *do justice* (emphasis added)," [10] and another extolling the use of the writ in *Leyra* v. *Denno,* 347 U. S. 556 (1954), with the assertion that "[b]ut for federal habeas corpus, these two men would have gone to their deaths for crimes of which they were found not guilty." [11]

I am aware that history reveals no exact tie of the writ of habeas corpus to a constitutional claim relating to innocence or guilt. Traditionally, the writ was unavailable even for many constitutional pleas grounded on a claimant's innocence, while many contemporary proponents of expanded employment of the writ would permit its issuance for one whose deserved confinement was never in doubt. We are now faced, however, with the task of accommodating the historic respect for the finality of the judgment of a committing court with recent Court expansions of the role of the writ. This accommodation can best be achieved, with due regard to all of the values implicated, by recourse to the central reason for habeas corpus: the affording of means,

---

[10] Pollak, Proposals to Curtail Federal Habeas Corpus for State Prisoners: Collateral Attack on the Great Writ, 66 Yale L. J. 50, 65 (1956).

[11] Reitz, Federal Habeas Corpus: Postconviction Remedy for State Prisoners, 108 U. Pa. L. Rev. 461, 497 (1960).

through an extraordinary writ, of redressing an *unjust* incarceration.

Federal habeas review of search and seizure claims is rarely relevant to this reason. Prisoners raising Fourth Amendment claims collaterally usually are quite *justly* detained. The evidence obtained from searches and seizures is often "the clearest proof of guilt" with a very high content of reliability.[12] Rarely is there any contention that the search rendered the evidence unreliable or that its means cast doubt upon the prisoner's guilt. The words of Mr. Justice Black drive home the point:

> "A claim of illegal search and seizure under the Fourth Amendment is crucially different from many other constitutional rights; ordinarily the evidence seized can in no way have been rendered untrustworthy by the means of its seizure and indeed often this evidence alone establishes beyond virtually any shadow of a doubt that the defendant is guilty." *Kaufman* v. *United States,* 394 U. S., at 237 (1969) (dissenting opinion).

Habeas corpus review of search and seizure claims thus brings a deficiency of our system of criminal justice into sharp focus: a convicted defendant asserting no constitutional claim bearing on innocence and relying solely on an alleged unlawful search, is now entitled to federal habeas review of state conviction and the likelihood of release if the reviewing court concludes that the search was unlawful. That federal courts would actually redetermine constitutional claims bearing no relation to the prisoner's innocence with the possibility of releasing him from custody if the search is held unlawful not only defeats our societal interest in a rational legal system but serves no compensating ends of personal justice.

---

[12] Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142, 160 (1970).

## IV

This unprecedented extension of habeas corpus far beyond its historic bounds and in disregard of the writ's central purpose is an anomaly in our system sought to be justified only by extrinsic reasons which will be addressed in Part V of this opinion. But first let us look at the costs of this anomaly—costs in terms of serious intrusions on other societal values. It is these other values that have been subordinated—not to further justice on behalf of arguably innocent persons but all too often to serve mechanistic rules quite unrelated to justice in a particular case. Nor are these neglected values unimportant to justice in the broadest sense or to our system of Government. They include (i) the most effective utilization of limited judicial resources, (ii) the necessity of finality in criminal trials, (iii) the minimization of friction between our federal and state systems of justice, and (iv) the maintenance of the constitutional balance upon which the doctrine of federalism is founded.

When raised on federal habeas, a claim generally has been considered by two or more tiers of state courts. It is the solemn duty of these courts, no less than federal ones, to safeguard personal liberties and consider federal claims in accord with federal law. The task which federal courts are asked to perform on habeas is thus most often one that has or should have been done before. The presumption that "if a job can be well done once, it should not be done twice" is sound and one calculated to utilize best "the intellectual, moral, and political resources involved in the legal system." [13]

---

[13] Bator, *supra,* n. 3, at 451.

The conventional justifications for extending federal habeas corpus to afford collateral review of state court judgments were summarized in *Kaufman* v. *United States,* 394 U. S. 217, 225–226, as follows:

"[T]he necessity that federal courts have the 'last say' with re-

Those resources are limited but demand on them constantly increases. There is an insistent call on federal courts both in civil actions, many novel and complex, which affect intimately the lives of great numbers of people and in original criminal trials and appeals which deserve our most careful attention.[14] To the extent the federal courts are required to re-examine claims on collat-

spect to questions of federal law, the inadequacy of state procedures to raise and preserve federal claims, the concern that state judges may be unsympathetic to federally created rights, the institutional constraints on the exercise of this Court's certiorari jurisdiction to review state convictions . . . ."

Each of these justifications has merit in certain situations, although the asserted inadequacy of state procedures and unsympathetic attitude of state judges are far less realistic grounds of concern than in years past. The issue, fundamentally, is one of perspective and a rational balancing. The appropriateness of federal collateral review is evident in many instances. But it hardly follows that, in order to promote the ends of individual justice which are the foremost concerns of the writ, it is necessary to extend the scope of habeas review indiscriminately. This is especially true with respect to federal review of Fourth Amendment claims with the consequent denigration of other important societal values and interests.

[14] Briefly, civil filings in United States district courts increased from 58,293 in 1961 to 96,173 in 1972. Total appeals commenced in the United States courts of appeals advanced from 4,204 in 1961 to 14,535 in 1972. Petitions for federal habeas corpus filed by state prisoners jumped from 1,020 in 1961 to 7,949 in 1972. Though habeas petitions filed by state prisoners did decline from 9,063 in 1970 to 7,949 in 1972, the overall increase from 1,000 at the start of the last decade is formidable. Furthermore, civil rights prisoner petitions under 42 U. S. C. § 1983 increased from 1,072 to 3,348 in the past five years. Some of these challenged the fact and duration of confinement and sought release from prison and must now be brought as actions for habeas corpus, *Preiser* v. *Rodriguez,* 411 U. S. 475 (1973). See 1972 Annual Report of the Director of the Administrative Office of the United States Courts II–5, II–22, II–28–32.

eral attack,[15] they deprive primary litigants of their prompt availability and mature reflection. After all, the resources of our system are finite: their overextension jeopardizes the care and quality essential to fair adjudication.

The present scope of federal habeas corpus also has worked to defeat the interest of society in a rational point of termination for criminal litigation. Professor Amsterdam has identified some of the finality interests at stake in collateral proceedings:

> "They involve (a) duplication of judicial effort; (b) delay in setting the criminal proceeding at rest; (c) inconvenience and possibly danger in transporting a prisoner to the sentencing court for hearing; (d) postponed litigation of fact, hence litigation which will often be less reliable in reproducing the facts (i) respecting the postconviction claim itself, and (ii) respecting the issue of guilt if the collateral attack succeeds in a form which allows retrial. . . ."

He concluded that:

> "[I]n combination, these finality considerations amount to a more or less persuasive argument against the cognizability of any particular collateral

---

[15] MR. CHIEF JUSTICE BURGER has illustrated the absurd extent to which relitigation is sometimes allowed:

"In some of these multiple trial and appeal cases [on collateral attack] the accused continued his warfare with society for eight, nine, ten years and more. In one case . . . more than fifty appellate judges reviewed the case on appeals." Address before the Association of the Bar of the City of New York, N. Y. L. J., Feb. 19, 1970, p. 1.

The English courts, "long admired for [their] fair treatment of accused persons," have never so extended habeas corpus. Friendly, *supra*, n. 12, at 145.

claim, the strength of the argument depending upon the nature of the claim, the manner of its treatment (if any) in the conviction proceedings, and the circumstances under which collateral litigation must be had." [16]

No effective judicial system can afford to concede the continuing theoretical possibility that there is error in every trial and that every incarceration is unfounded. At some point the law must convey to those in custody that a wrong has been committed, that consequent punishment has been imposed, that one should no longer look back with the view to resurrecting every imaginable basis for further litigation but rather should look forward to rehabilitation and to becoming a constructive citizen.[17]

Nowhere should the merit of this view be more self-evident than in collateral attack on an allegedly unlawful search and seizure, where the petitioner often asks society to *redetermine* a claim with no relationship at all to the justness of his confinement. Professor Amsterdam has noted that "for reasons which are common to all search and seizure claims," he "would hold even a slight finality interest sufficient to deny the collateral remedy." [18] But, in fact, a strong finality interest militates against allow-

---

[16] Amsterdam, Search, Seizure, and Section 2255: A Comment, 112 U. Pa. L. Rev. 378, 383–384 (1964). The article addresses the problem of collateral relief for federal prisoners, but its rationale applies forcefully to federal habeas for state prisoners as well.

[17] Mr. Justice Harlan put it very well:

"Both the individual criminal defendant and society have an interest in insuring that there will at some point be the certainty that comes with an end to litigation, and that attention will ultimately be focused not on whether a conviction was free from error but rather on whether the prisoner can be restored to a useful place in the community." *Sanders* v. *United States*, 373 U. S. 1, 24–25 (1963) (dissenting opinion).

[18] *Supra*, n. 16, at 388.

ing collateral review of search-and-seizure claims. Apart from the duplication of resources inherent in most habeas corpus proceedings, the validity of a search-and-seizure claim frequently hinges on a complex matrix of events which may be difficult indeed for the habeas court to disinter especially where, as often happens, the trial occurred years before the collateral attack and the state record is thinly sketched.[19]

Finally, the present scope of habeas corpus tends to undermine the values inherent in our federal system of government. To the extent that every state criminal judgment is to be subject indefinitely to broad and repetitive federal oversight, we render the actions of state courts a serious disrespect in derogation of the constitutional balance between the two systems.[20] The present expansive scope of federal habeas review has prompted no small friction between state and federal judiciaries. Justice Paul C. Reardon of the Massachusetts Supreme

---

[19] The latter occurs for various reasons, namely, failure of the accused to raise the claim at trial, a determination by the state courts that the claim did not merit a hearing, or a recent decision of this Court extending rights of the accused (although, on Fourth Amendment claims, such decisions have seldom been applied retroactively, see, *e. g., Linkletter* v. *Walker,* 381 U. S. 618 (1965)).

[20] The dispersion of power between State and Federal Governments is constitutionally premised, as Mr. Justice Harlan observed:

"[I]t would surely be shallow not to recognize that the structure of our political system accounts no less for the free society we have. Indeed, it was upon the structure of government that the founders primarily focused in writing the Constitution. Out of bitter experience they were suspicious of every form of all-powerful central authority and they sought to assure that such a government would never exist in this country by structuring the federal establishment so as to diffuse power between the executive, legislative, and judicial branches. The diffusion of power between federal and state authority serves the same ends and takes on added significance as the size of the federal bureaucracy continues to grow." Thoughts at a Dedica-

Judicial Court and then President of the National Center for State Courts, in identifying problems between the two systems, noted bluntly that "[t]he first, without question, is the effect of Federal habeas corpus proceedings on State courts." He spoke of the "humiliation of review from the full bench of the highest State appellate court to a single United States District Court judge." Such broad federal habeas powers encourage in his view the "growing denigration of the State courts and their functions in the public mind." [21] In so speaking Justice Reardon echoed the words of Professor Bator:

"I could imagine nothing more subversive of a judge's sense of responsibility, of the inner subjective conscientiousness which is so essential a part of the difficult and subtle art of judging well, than an in-

tion: Keeping the Judicial Function in Balance, 49 A. B. A. J. 943, 943–944 (1963).

The Justice recognized that problems of habeas corpus jurisdiction were "of constitutional dimensions going to the heart of the division of judicial powers in a federal system." *Fay* v. *Noia*, 372 U. S. 391, 464 (1963) (dissenting opinion). Nor have such perceptions ever been the product of but a single Justice. As the Court noted in a historic decision on the conflicting realms of state and federal judicial power:

"[T]he Constitution of the United States . . . recognizes and preserves the autonomy and independence of the States—independence in their legislative and independence in their judicial departments. Supervision over either the legislative or the judicial action of the States is in no case permissible except as to matters by the Constitution specifically authorized or delegated to the United States. Any interference with either, except as thus permitted, is an invasion of the authority of the State and, to that extent, a denial of its independence." *Erie R. Co.* v. *Tompkins*, 304 U. S. 64, 78–79 (1938), quoting Mr. Justice Field in *Baltimore & O. R. Co.* v. *Baugh*, 149 U. S. 368, 401 (1893).

[21] Address at the annual dinner of the Section of Judicial Administration, American Bar Association, San Francisco, California, Aug. 14, 1972, pp. 5, 9, and 10.

discriminate acceptance of the notion that all the shots will always be called by someone else." [22]

In my view, this Court has few more pressing responsibilities than to restore the mutual respect and the balanced sharing of responsibility between the state and federal courts which our tradition and the Constitution itself so wisely contemplate. This can be accomplished without retreat from our inherited insistence that the writ of habeas corpus retain its full vitality as a means of redressing injustice.

This case involves only a relatively narrow aspect of the appropriate reach of habeas corpus. The specific issue before us, and the only one that need be decided at this time, is the extent to which a state prisoner may obtain federal habeas corpus review of a Fourth Amendment claim. Whatever may be formulated as a more comprehensive answer to the important broader issues (whether by clarifying legislation or in subsequent decisions), Mr. Justice Black has suggested what seems to me to be the appropriate threshold requirement in a case of this kind:

> "I would always require that the convicted defendant raise the kind of constitutional claim that casts some shadow of a doubt on his guilt." *Kaufman* v. *United States*, 394 U. S., at 242 (dissenting opinion).

In a perceptive analysis, Judge Henry J. Friendly expressed a similar view. He would draw the line against habeas corpus review in the absence of a "colorable claim of innocence":

> "[W]ith a few important exceptions, convictions should be subject to collateral attack only when

---

[22] Bator, *supra*, n. 3, at 451.

the prisoner supplements his constitutional plea with a colorable claim of innocence." [23]

Where there is no constitutional claim bearing on innocence, the inquiry of the federal court on habeas review of a state prisoner's Fourth Amendment claim should be confined solely to the question whether the defendant was provided a fair opportunity in the state courts to raise and have adjudicated the Fourth Amendment claim. Limiting the scope of habeas review in this manner would reduce the role of the federal courts in determining the merits of constitutional claims with no relation to a petitioner's innocence and contribute to the restoration of recently neglected values to their proper place in our criminal justice system.

V

The importance of the values referred to above is not questioned. What, then, is the reason which has prompted this Court in recent decisions to extend habeas corpus to Fourth Amendment claims largely in disregard of its history as well as these values? In addressing Mr. Justice Black's dissenting view that constitutional claims raised collaterally should be relevant to the petitioner's innocence, the majority in *Kaufman* noted:

"It [Mr. Justice Black's view] brings into question *the propriety of the exclusionary rule itself.* The application of that rule is not made to turn on the

---

[23] Friendly, *supra*, n. 12, at 142. Judge Friendly's thesis, as he develops it, would encompass collateral attack broadly both within the federal system and with respect to federal habeas for state prisoners. Subject to the exceptions carefully delineated in his article, Judge Friendly would apply the criterion of a "colorable showing of innocence" to any collateral attack of a conviction, including claims under the Fifth and Sixth as well as the Fourth Amendments. *Id.,* at 151–157. In this case we need not consider anything other than the Fourth Amendment claims.

existence of a possibility of innocence; rather, exclusion of illegally obtained evidence is deemed necessary to protect the right of all citizens, not merely the citizen on trial, to be secure against unreasonable searches and seizures." 394 U. S., at 229. (Emphasis added.)

The exclusionary rule has occasioned much criticism, largely on grounds that its application permits guilty defendants to go free and law-breaking officers to go unpunished.[24] The oft-asserted reason for the rule is to deter illegal searches and seizures by the police, *Elkins* v. *United States,* 364 U. S. 206, 217 (1960); *Mapp* v. *Ohio,* 367 U. S. 643, 656 (1961); *Linkletter* v. *Walker,* 381 U. S. 618, 636 (1965); *Terry* v. *Ohio,* 392 U. S. 1, 29 (1968).[25]

---

[24] See *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388, 411 (BURGER, C. J., dissenting); Paulsen, The Exclusionary Rule and Misconduct by the Police, 52 J. Crim. L. C. & P. S. 255, 256 (1961); see also J. Wilson, Varieties of Police Behavior (1968); 8 J. Wigmore, Evidence § 2184, pp. 51–52 (J. McNaughton ed. 1961), and H. Friendly, Benchmarks 260–261 (1967), suggesting that even at trial the exclusionary rule should be limited to exclusion of "the fruit of activity intentionally or flagrantly illegal." But see Kamisar, Public Safety v. Individual Liberties: Some "Facts" and "Theories," 53 J. Crim. L. C. & P. S. 171, 188–190 (1962), and Kamisar, On the Tactics of Police-Prosecution Oriented Critics of the Courts, 49 Cornell L. Q. 436 (1964).

[25] These expressions antedated the only scholarly empirical research, MR. JUSTICE STEWART having noted in *Elkins* v. *United States,* 364 U. S. 206, 218 (1960), that "[e]mpirical statistics are not available" as to the efficacy of the rule—a situation which continued until Professor Oaks' study. Indeed, in referring to the basis for the exclusionary rule, Professor Oaks noted that it has been supported, not by facts, but by "recourse to polemic, rhetoric, and intuition." Studying the Exclusionary Rule in Search and Seizure, 37 U. Chi. L. Rev. 665, 755 (1970). See also Burger, Who Will Watch the Watchman?, 14 Am. U. L. Rev. 1 (1964).

I mention the controversy over the exclusionary rule—not to suggest here its total abandonment (certainly not in the absence of

268

The efficacy of this deterrent function, however, has been brought into serious question by recent empirical research. Whatever the rule's merits on an initial trial and appeal [26]—a question not in issue here—the case for

some other deterrent to deviant police conduct) but rather to emphasize its precarious and undemonstrated basis, especially when applied to a Fourth Amendment claim on federal habeas review of a state court decision.

[26] The most searching empirical study of the efficacy of the exclusionary rule was made by Professor Oaks, who concluded that "[a]s a device for directly deterring illegal searches and seizures by the police, the exclusionary rule is a failure." *Supra*, n. 25, at 755. Professor Oaks, though recognizing that conclusive data may not yet be available, summarized the results of his study as follows:

"There is no reason to expect the rule to have any direct effect on the overwhelming majority of police conduct that is not meant to result in prosecutions, and there is hardly any evidence that the rule exerts any deterrent effect on the small fraction of law enforcement activity that is aimed at prosecution. What is known about the deterrent effect of sanctions suggests that the exclusionary rule operates under conditions that are extremely unfavorable for deterring the police. The harshest criticism of the rule is that it is ineffective. It is the sole means of enforcing the essential guarantees of freedom from unreasonable arrests and searches and seizures by law enforcement officers, and it is a failure in that vital task.

"The use of the exclusionary rule imposes excessive costs on the criminal justice system. It provides no recompense for the innocent and it frees the guilty. It creates the occasion and incentive for largescale lying by law enforcement officers. It diverts the focus of the criminal prosecution from the guilt or innocence of the defendant to a trial of the police. Only a system with limitless patience with irrationality could tolerate the fact that where there has been one wrong, the defendant's, he will be punished, but where there have been two wrongs, the defendant's and the officer's, both will go free. This would not be an excessive cost for an effective remedy against police misconduct, but it is a prohibitive price to pay for an illusory one." *Id.*, at 755.

Despite a conviction that the exclusionary rule is a "failure," Professor Oaks would not abolish it altogether until there is something to take its place. He recommends "an effective tort remedy against

collateral application of the rule is an anemic one. On collateral attack, the exclusionary rule retains its major liabilities while the asserted benefit of the rule dissolves. For whatever deterrent function the rule may serve when applied on trial and appeal becomes greatly attenuated when, months or years afterward, the claim surfaces for collateral review. The impermissible conduct has long since occurred, and the belated wrist slap of state police by federal courts harms no one but society on whom the convicted criminal is newly released.[27]

Searches and seizures are an opaque area of the law: flagrant Fourth Amendment abuses will rarely escape detection but there is a vast twilight zone with respect to which one Justice has stated that our own "decisions . . . are hardly notable for their predictability," [28] and another has observed that this Court was " 'bifurcating elements too infinitesimal to be split.' " [29] Serious Fourth Amendment infractions can be dealt with by state judges or by this Court on direct review. But the nonfrivolous Fourth Amendment claims that survive for collateral attack are most likely to be in this grey, twilight area, where the law is difficult for courts to apply, let alone for the policeman on the beat to understand. This is,

the offending officer or his employer." He notes that such a "tort remedy would give courts an occasion to rule on the content of constitutional rights (the Canadian example shows how), and it would provide the real consequence needed to give credibility to the guarantee." *Id.*, at 756–757.

[27] "As the exclusionary rule is applied time after time, it seems that its deterrent efficacy at some stage reaches a point of diminishing returns, and beyond that point its continued application is a public nuisance." Amsterdam, *supra*, n. 16, at 389:

[28] *Ker* v. *California*, 374 U. S. 23, 45 (1963) (Harlan, J., concurring in result).

[29] *Coolidge* v. *New Hampshire*, 403 U. S. 443, 493 (1971) (opinion of BURGER, C. J.). THE CHIEF JUSTICE was quoting Mr. Justice Stone of the Minnesota Supreme Court.

precisely the type of case where the deterrent function of the exclusionary rule is least efficacious, and where there is the least justification for freeing a duly convicted defendant.[30]

Our decisions have not encouraged the thought that what may be an appropriate constitutional policy in one context automatically becomes such for all times and all seasons. In *Linkletter* v. *Walker*, 381 U. S., at 629, the Court recognized the compelling practical considerations against retroactive application of the exclusionary rule. Rather than viewing the rule as having eternal constitutional verity, the Court decided to

> "weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation. We believe that this approach is particularly correct with reference to the Fourth Amendment's prohibitions as to unreasonable searches and seizures." *Id.*, at 629.

Such a pragmatic approach compelled the Court to conclude that the rule's deterrent function would not be advanced by its retrospective application:

> "The misconduct of the police prior to *Mapp* has already occurred and will not be corrected by releasing the prisoners involved. . . . Finally, the ruptured privacy of the victims' homes and effects cannot be restored. Reparation comes too late." *Id.*, at 637.

See also *Desist* v. *United States,* 394 U. S. 244 (1969).

The same practical, particularized analysis of the exclusionary rule's necessity also was evident in *Walder* v. *United States,* 347 U. S. 62 (1954), when the Court per-

---

[30] Friendly, *supra,* n. 12, at 162–163.

mitted the Government to utilize unlawfully seized evidence to impeach the credibility of a defendant who had first testified broadly in his own defense. The Court held, in effect, that the policies protected by the exclusionary rule were outweighed in this case by the need to prevent perjury and assure the integrity of proceedings at trial. The Court concluded that to apply the exclusionary rule in such circumstances "would be a perversion of the Fourth Amendment." *Id.,* at 65. The judgment in *Walder* revealed most pointedly that the policies behind the exclusionary rule are neither absolute nor all-encompassing, but rather must be weighed and balanced against a competing and more compelling policy, namely the need for effective determination of truth at trial.

In sum: the case for the exclusionary rule varies with the setting in which it is imposed. It makes little sense to extend the *Mapp* exclusionary rule to a federal habeas proceeding where its asserted deterrent effect must be least efficacious, and its obvious harmful consequences persist in full force.

## VI

The final inquiry is whether the above position conforms to 28 U. S. C. § 2254 (a) which provides:

> "The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."

The trend in recent years has witnessed a proliferation of constitutional rights, "a vast expansion of the claims of error in criminal cases for which a resourceful defense lawyer can find a constitutional basis." [31] Federal ha-

---

[31] Friendly, *supra,* n. 12, at 156.

beas jurisdiction has been extended far beyond anyone's expectation or intendment when the concept of "custody in violation of the Constitution," now in § 2254 (a), first appeared in federal law over a century ago.[32]

Mr. Justice Black was clearly correct in noting that "not every conviction based in part on a denial of a constitutional right is subject to attack by habeas corpus or § 2255 proceedings after a conviction has become final." *Kaufman*, 394 U. S., at 232 (dissenting opinion). No evidence exists that Congress intended every allegation of a constitutional violation to afford an appropriate basis for collateral review: indeed, the latest revisions of the Federal Habeas Corpus statute in 1966 [33] and the enactment of § 2254 (a) came at the time a majority of the courts of appeals held that claims of unlawful search and seizure " 'are not proper matters to be presented by a motion to vacate sentence under § 2255 but can only be properly presented by appeal from the conviction.' " *Id.*, at 220, quoting *Warren* v. *United States*, 311 F. 2d 673, 675 (CA8 1963).[34] Though the precise discussion in *Kaufman* concerned the claims of federal prisoners under § 2255, the then-existing principle of a distinction between review of search-and-seizure claims in direct and collateral proceedings clearly existed.

There is no indication that Congress intended to wipe out this distinction. Indeed, the broad purpose of the 1966 amendments pointed in the opposite direction. The report of the Senate Judiciary Committee notes that:

> "Although only a small number of these [habeas] applications have been found meritorious, the ap-

---

[32] See Part II, *supra*.

[33] The 1966 revision of the Federal Habeas Corpus statute enacted among other things, the present 28 U. S. C. §§ 2254 (a), (d), (e), and (f).

[34] See *Kaufman, supra*, at 220–221, nn. 3 and 4, for a listing of the respective positions of the courts of appeals.

plications in their totality have imposed a heavy burden on the Federal courts. . . . The bill seeks to alleviate the unnecessary burden by introducing a greater degree of finality of judgments in habeas corpus proceedings." S. Rep. No. 1797, 89th Cong., 2d Sess., 2 (1966).[35]

The House Report states similarly that:

"While in only a small number of these applications have the petitioners been successful, they nevertheless have not only imposed an unnecessary burden on the work of the Federal courts but have also greatly interfered with the procedures and processes of the State courts by delaying, in many cases, the proper enforcement of their judgments." H. R. Rep. No. 1892, 89th Cong., 2d Sess., 5 (1966).

This most recent congressional expression on the scope of federal habeas corpus reflected the sentiment, shared alike by judges and legislators, that the writ has overrun its historical banks to inundate the dockets of federal courts and denigrate the role of state courts. Though Congress did not address the precise question at hand, nothing in § 2254 (a), the state of the law at the time of its adoption, or the historical uses of the language "custody in violation of the Constitution" from which § 2254 (a) is derived,[36] compels a holding that rulings of state courts on claims of unlawful search and

---

[35] The letter from Circuit Judge Orie L. Phillips, Chairman of the Committee on Habeas Corpus of the Judicial Conference of the United States, which sponsored the 1966 legislation, to the Chairman of the Senate Subcommittee on Improvements in Judicial Machinery also strongly emphasized the necessity of expediting "the determination in Federal courts of nonmeritorious and repetitious applications for the writ by State court prisoners." S. Rep. No. 1797, 89th Cong., 2d Sess., 5 (1966).

[36] See Part II, *supra.*

seizure must be reviewed and redetermined in collateral proceedings.

## VII

Perhaps no single development of the criminal law has had consequences so profound as the escalating use, over the past two decades, of federal habeas corpus to reopen and readjudicate state criminal judgments. I have commented in Part IV above on the far-reaching consequences: the burden on the system,[37] in terms of demands on the courts, prosecutors, defense attorneys, and other personnel and facilities; the absence of efficiency and finality in the criminal process, frustrating both the deterrent function of the law and the effectiveness of rehabilitation; the undue subordination of state courts, with the resulting exacerbation of state-federal relations; and the subtle erosion of the doctrine of federalism itself. Perhaps the single most disquieting consequence of open-ended habeas review is reflected in the prescience of Mr. Justice Jackson's warning that "[i]t must prejudice the occasional meritorious application to be buried in a flood of worthless ones." [38]

If these consequences flowed from the safeguarding of constitutional claims of innocence they should, of course, be accepted as a tolerable price to pay for cherished standards of justice at the same time that efforts are pursued to find more rational procedures. Yet, as illustrated by the case before us today, the question on habeas corpus is

---

[37] Mr. Justice Jackson, concurring in the result 20 years ago in *Brown* v. *Allen,* 344 U. S. 443, 532 (1953), lamented the "floods of stale, frivolous and repetitious petitions [for federal habeas corpus by state prisoners which] inundate the docket of the lower courts and swell our own." *Id.,* at 536. The inundation which concerned Mr. Justice Jackson consisted of 541 such petitions. In 1971, the latest year for which figures are available, state prisoners alone filed 7,949 petitions for habeas in federal district courts, over 14 times the number filed when Mr. Justice Jackson voiced his misgivings.

[38] *Brown* v. *Allen, supra,* at 537.

too rarely whether the prisoner was innocent of the crime for which he was convicted [39] and too frequently whether some evidence of undoubted probative value has been admitted in violation of an exclusionary rule ritualistically applied without due regard to whether it has the slightest likelihood of achieving its avowed prophylactic purpose.

It is this paradox of a system, which so often seems to subordinate substance to form, that increasingly provokes criticism and lack of confidence. Indeed, it is difficult to explain why a system of criminal justice deserves respect which allows repetitive reviews of convictions long since held to have been final at the end of the normal process of trial and appeal where the basis for re-examination is not even that the convicted defendant was innocent. There has been a halo about the "Great Writ" that no one would wish to dim. Yet one must wonder whether the stretching of its use far beyond any justifiable purpose will not in the end weaken rather than strengthen the writ's vitality.

MR. JUSTICE DOUGLAS, dissenting.

I agree with the Court of Appeals that "verbal assent" to a search is not enough, that the fact that consent was given to the search does not imply that the suspect knew that the alternative of a refusal existed. 448 F. 2d 699, 700. As that court stated:

"[U]nder many circumstances a reasonable person might read an officer's 'May I' as the courteous ex-

---

[39] Commenting on this distortion of our criminal justice system, Justice Walter Schaefer of the Illinois Supreme Court has said:

"What bothers me is that almost never do we have a genuine issue of guilt or innocence today. The system has so changed that what we are doing in the courtroom is trying the conduct of the police and that of the prosecutor all along the line." Address before Center for the Study of Democratic Institutions, June 1968, cited by Friendly, *supra*, n. 12, at 145 n. 12.

pression of a demand backed by force of law." *Id.,* at 701.

A considerable constitutional guarantee rides on this narrow issue. At the time of the search there was no probable cause to believe that the car contained contraband or other unlawful articles. The car was stopped only because a headlight and the license plate light were burned out. The car belonged to Alcala's brother, from whom it was borrowed, and Alcala had a driver's license. Traffic citations were appropriately issued. The car was searched, the present record showing that Alcala consented. But whether Alcala knew he had the right to refuse, we do not know. All the Court of Appeals did was to remand the case to the District Court for a finding—and if necessary, a hearing on that issue.

I would let the case go forward on that basis. The long, time-consuming contest in this Court might well wash out. At least we could be assured that, if it came back, we would not be rendering an advisory opinion. Had I voted to grant this petition, I would suggest we dismiss it as improvidently granted. But, being in the minority, I am bound by the Rule of Four.

MR. JUSTICE BRENNAN, dissenting.

The Fourth Amendment specifically guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." We have consistently held that governmental searches conducted pursuant to a validly obtained warrant or reasonably incident to a valid arrest do not violate this guarantee. Here, however, as the Court itself recognizes, no search warrant was obtained and the State does not even suggest "that there was probable cause to search the vehicle or that the search was incident to a valid arrest of any of the occupants." *Ante,*

at 227–228. As a result, the search of the vehicle can be justified solely on the ground that the owner's brother gave his consent—that is, that he waived his Fourth Amendment right "to be secure" against an otherwise "unreasonable" search. The Court holds today that an individual can effectively waive this right even though he is totally ignorant of the fact that, in the absence of his consent, such invasions of his privacy would be constitutionally prohibited. It wholly escapes me how our citizens can meaningfully be said to have waived something as precious as a constitutional guarantee without ever being aware of its existence. In my view, the Court's conclusion is supported neither by "linguistics," nor by "epistemology," nor, indeed, by "common sense." I respectfully dissent.

MR. JUSTICE MARSHALL, dissenting.

Several years ago, MR. JUSTICE STEWART reminded us that "[t]he Constitution guarantees . . . a society of free choice. Such a society presupposes the capacity of its members to choose." *Ginsberg* v. *New York,* 390 U. S. 629, 649 (1968) (concurring in result). I would have thought that the capacity to choose necessarily depends upon knowledge that there is a choice to be made. But today the Court reaches the curious result that one can choose to relinquish a constitutional right— the right to be free of unreasonable searches—without knowing that he has the alternative of refusing to accede to a police request to search.[1] I cannot agree, and therefore dissent.

---

[1] The Court holds that Alcala's consent to search was shown, in the state court proceedings, to be constitutionally valid as a relinquishment of his Fourth Amendment rights. In those proceedings, no evidence was adduced as to Alcala's knowledge of his right to refuse assent. The Court of Appeals for the Ninth Circuit, whose judgment is today reversed, would have required petitioner to pro-

## I

I believe that the Court misstates the true issue in this case. That issue is not, as the Court suggests, whether the police overbore Alcala's will in eliciting his consent, but rather, whether a simple statement of assent to search, without more,[2] should be sufficient to permit the police to search and thus act as a relinquishment of Alcala's constitutional right to exclude the police.[3] This Court has always scrutinized with great care claims that a person has forgone the opportunity to assert constitutional rights. See, e. g., *Fuentes* v. *Shevin,* 407 U. S. 67 (1972); *D. H. Overmyer Co.* v. *Frick Co.,* 405 U. S. 174 (1972); *Boykin* v. *Alabama,* 395 U. S. 238 (1969); *Carnley* v. *Cochran,* 369 U. S. 506 (1962). I see no reason to give the claim that a person consented to a search any less rigorous scrutiny. Every case in this Court involving this kind of search has heretofore spoken

---

duce such evidence. As discussed *infra,* at 286, the Court of Appeals did not hold that the police must inform a subject of investigation of his right to refuse assent as an essential predicate to their effort to secure consent to search.

[2] The Court concedes that the police lacked probable cause to search. *Ante,* at 227–228. At the time the search was conducted, there were three police vehicles near the car. 270 Cal. App. 2d 648, 651, 76 Cal. Rptr. 17, 19 (1969). Perhaps the police in fact had some reason, not disclosed in this record, to believe that a search would turn up incriminating evidence. But it is also possible that the late hour and the number of men in the car suggested to the first officer on the scene that it would be prudent to wait until other officers had arrived before investigating any further.

[3] Because Bustamonte was charged with possessing stolen checks found in the search at which he was present, he has standing to object to the search even though he claims no possessory or proprietary interest in the car. *Jones* v. *United States,* 362 U. S. 257 (1960). Cf. *People* v. *Ibarra,* 60 Cal. 2d 460, 386 P. 2d 487 (1963); *People* v. *Perez,* 62 Cal. 2d 769, 401 P. 2d 934 (1965).

of consent as a waiver.[4]  See, *e. g., Amos* v. *United States,* 255 U. S. 313, 317 (1921); *Zap* v. *United States,* 328 U. S. 624, 628 (1946); *Johnson* v. *United States,* 333 U. S. 10, 13 (1948).[5]  Perhaps one skilled in lin-

---

[4] The Court reads *Davis* v. *United States,* 328 U. S. 582 (1946), as upholding a search like the one in this case on the basis of consent.  But it was central to the reasoning of the Court in that case that the items seized were the property of the Government temporarily in Davis' custody.  See *id.,* at 587–593.  The agents of the Government were thus simply demanding that property to which they had a lawful claim be returned to them.  Because of this, the Court held that "permissible limits of persuasion are not so narrow as where *private* papers are sought." *Id.,* at 593.  The opinion of the Court therefore explicitly disclaimed stating a general rule for ordinary searches for evidence.  That the distinction, for purposes of Fourth Amendment analysis, between mere evidence and contraband or instrumentalities has now been abolished, *Warden* v. *Hayden,* 387 U. S. 294 (1967), is no reason to disregard the fact that when *Davis* was decided, that distinction played an important role in shaping analysis.

In *Zap* v. *United States,* 328 U. S. 624, 628 (1946), the Court held that "when petitioner, in order to obtain the Government's business, specifically agreed to permit inspection of his accounts and records, he *voluntarily waived* such claim to privacy which he otherwise might have had as respects business documents related to those contracts." (Emphasis added.)  Because Zap had signed a contract specifically providing that his records would be open at all time to the Government, he had indeed waived his right to keep those records private.  Cf. *United States* v. *Biswell,* 406 U. S. 311 (1972).

[5] Aside from *Zap* and *Davis, supra,* n. 4, I have found no cases decided by this Court explicitly upholding a search based on the consent of the defendant.  It is hardly surprising, then, that "[t]he approach of the Court of Appeals for the Ninth Circuit finds no support in any of our decisions," *ante,* at 229.  But in nearly every case discussing the problem at length, the Court referred to consent as a waiver.  And it mischaracterizes those cases to describe them as analyzing the totality of the circumstances, *ante,* at 243 n. 31. See *infra,* at 283–284.

guistics or epistemology can disregard those comments, but I find them hard to ignore.

To begin, it is important to understand that the opinion of the Court is misleading in its treatment of the issue here in three ways. First, it derives its criterion for determining when a verbal statement of assent to search operates as a relinquishment of a person's right to preclude entry from a justification of consent searches that is inconsistent with our treatment in earlier cases of exceptions to the requirements of the Fourth Amendment, and that is not responsive to the unique nature of the consent-search exception. Second, it applies a standard of voluntariness that was developed in a very different context, where the standard was based on policies different from those involved in this case. Third, it mischaracterizes our prior cases involving consent searches.

## A

The Court assumes that the issue in this case is: what are the standards by which courts are to determine that consent is voluntarily given? It then imports into the law of search and seizure standards developed to decide entirely different questions about coerced confessions.[6]

The Fifth Amendment, in terms, provides that no person "shall be compelled in any criminal case to be a witness against himself." Nor is the interest protected by the Due Process Clause of the Fourteenth Amendment any different. The inquiry in a case where a confession is challenged as having been elicited in an unconstitutional manner is, therefore, whether the behavior

---

[6] That this application of the "domino" method of adjudication is misguided is shown, I believe, by the fact that the phrase "voluntary consent" seems redundant in a way that the phrase "voluntary confession" does not.

of the police amounted to compulsion of the defendant.[7] Because of the nature of the right to be free of compulsion, it would be pointless to ask whether a defendant knew of it before he made a statement; no sane person would knowingly relinquish a right to be free of compulsion. Thus, the questions of compulsion and of violation of the right itself are inextricably intertwined. The cases involving coerced confessions, therefore, pass over the question of knowledge of that right as irrelevant, and turn directly to the question of compulsion.

*Miranda* v. *Arizona,* 384 U. S. 436 (1966), confirms this analysis. There the Court held that certain warnings must be given to suspects prior to their interrogation so that the inherently coercive nature of in-custody questioning would be diminished by the suspect's knowledge that he could remain silent. But, although those warnings, of course, convey information about various rights of the accused, the information is intended only to protect the suspect against acceding to the other coercive aspects of police interrogation. While we would not ordinarily think that a suspect could waive his right to be free of coercion, for example, we do permit suspects to waive the rights they are informed of by police warnings, on the belief that such information in itself sufficiently decreases the chance that a statement would be elicited by compulsion. *Id.,* at 475–476. Thus, nothing the defendant did in the cases involving coerced confessions was taken to operate as a relinquishment of his rights; certainly the fact that the defendant made

[7] The Court used the terms "voluntary" or "involuntary" in such cases as shorthand labels for an assessment of the police behavior in light of the particular characteristics of the individual defendant because behavior that might not be coercive of some individuals might nonetheless compel others to give incriminating statements. See, *e. g., Haley* v. *Ohio,* 332 U. S. 596, 599 (1948); *Stein* v. *New York,* 346 U. S. 156, 185 (1953); *Fikes* v. *Alabama,* 352 U. S. 191 (1957).

a statement was never taken to be a relinquishment of the right to be free of coercion.[8]

## B

In contrast, this case deals not with "coercion," but with "consent," a subtly different concept to which different standards have been applied in the past. Freedom from coercion is a substantive right, guaranteed by the Fifth and Fourteenth Amendments. Consent, however, is a mechanism by which substantive requirements, otherwise applicable, are avoided. In the context of the Fourth Amendment, the relevant substantive requirements are that searches be conducted only after evidence justifying them has been submitted to an impartial magistrate for a determination of probable cause. There are, of course, exceptions to these requirements based on a variety of exigent circumstances that make it impractical to invalidate a search simply because the police failed to get a warrant.[9] But none of the exceptions

---

[8] I, of course, agree with the Court's analysis to the extent that it treats a verbal expression of assent as no true consent when it is elicited through compulsion. *Ante*, at 229. Since, in my view, it is just as unconstitutional to search after coercing consent as it is to search after uninformed consent, I agree with the rationale of *Amos* v. *United States*, 255 U. S. 313 (1921), *Johnson* v. *United States*, 333 U. S. 10 (1948), and *Bumper* v. *North Carolina*, 391 U. S. 543 (1968). That an alternative rationale might have been used in those cases seems to me irrelevant.

[9] See, e. g., *Coolidge* v. *New Hampshire*, 403 U. S. 443 (1971); *Chimel* v. *California*, 395 U. S. 752 (1969); *Warden* v. *Hayden*, 387 U. S. 294 (1967).

In *Chimel*, we explained that searches incident to arrest were justified by the need to protect officers from attacks by the persons they have arrested, and by the need to assure that easily destructible evidence in the reach of the suspect will not be destroyed. 395 U. S., at 762–763. And in *Coolidge*, we said that searches of automobiles on the highway are justified because an alerted criminal might easily drive the evidence away while a warrant was sought.

relating to the overriding needs of law enforcement are applicable when a search is justified solely by consent. On the contrary, the needs of law enforcement are significantly more attenuated, for probable cause to search may be lacking but a search permitted if the subject's consent has been obtained. Thus, consent searches are permitted, not because such an exception to the requirements of probable cause and warrant is essential to proper law enforcement, but because we permit our citizens to choose whether or not they wish to exercise their constitutional rights. Our prior decisions simply do not support the view that a meaningful choice has been made solely because no coercion was brought to bear on the subject.

For example, in *Bumper* v. *North Carolina*, 391 U. S. 543 (1968), four law enforcement officers went to the home of Bumper's grandmother. They announced that they had a search warrant, and she permitted them to enter. Subsequently, the prosecutor chose not to rely on the warrant, but attempted to justify the search by the woman's consent. We held that consent could not be established "by showing no more than acquiescence to a claim of lawful authority," *id.*, at 548–549. We did not there inquire into all the circumstances, but focused on a single fact, the claim of authority, even though the grandmother testified that no threats were made. *Id.*, at 547 n. 8. It may be that, on the facts of that case, her consent was under all the circumstances involuntary, but it is plain that we did not apply the test adopted by the Court today. And, whatever the posture of the case when it reached this Court, it could

---

403 U. S., at 459–462. In neither situation is police convenience alone a sufficient reason for establishing an exception to the warrant requirement. Yet the Court today seems to say that convenience alone justifies consent searches.

not be said that the police in *Bumper* acted in a threatening or coercive manner, for they did have the warrant they said they had; the decision not to rely on it was made long after the search, when the case came into court.[10]

That case makes it clear that police officers may not courteously order the subject of a search simply to stand aside while the officers carry out a search they have settled on. Yet there would be no coercion or brutality in giving that order. No interests that the Court today recognizes would be damaged in such a search. Thus, all the police must do is conduct what will inevitably be a charade of asking for consent. If they display any firmness at all, a verbal expression of assent will undoubtedly be forthcoming. I cannot believe that the protections of the Constitution mean so little.

## II

My approach to the case is straightforward and, to me, obviously required by the notion of consent as a relinquishment of Fourth Amendment rights. I am at a loss to understand why consent "cannot be taken literally to mean a 'knowing' choice." *Ante,* at 224. In fact, I have difficulty in comprehending how a decision made without knowledge of available alternatives can be treated as a choice at all.

If consent to search means that a person has chosen to forgo his right to exclude the police from the place they seek to search, it follows that his consent cannot

---

[10] The Court's interpretation of *Johnson* v. *United States,* 333 U. S. 10 (1948), a similar case, is baffling. The Court in *Johnson* did not in fact analyze the totality of the circumstances, as the Court now argues, *ante,* at 243 n. 31; the single fact that the police claimed authority to search when in truth they lacked such authority conclusively established that no valid consent had been given.

be considered a meaningful choice unless he knew that he could in fact exclude the police. The Court appears, however, to reject even the modest proposition that, if the subject of a search convinces the trier of fact that he did not know of his right to refuse assent to a police request for permission to search, the search must be held unconstitutional. For it says only that "knowledge of the right to refuse consent is one factor to be taken into account." *Ante,* at 227. I find this incomprehensible. I can think of no other situation in which we would say that a person agreed to some course of action if he convinced us that he did not know that there was some other course he might have pursued. I would therefore hold, at a minimum, that the prosecution may not rely on a purported consent to search if the subject of the search did not know that he could refuse to give consent. That, I think, is the import of *Bumper* v. *North Carolina, supra.* Where the police claim authority to search yet in fact lack such authority, the subject does not know that he may permissibly refuse them entry, and it is this lack of knowledge that invalidates the consent.

If one accepts this view, the question then is a simple one: must the Government show that the subject knew of his rights, or must the subject show that he lacked such knowledge?

I think that any fair allocation of the burden would require that it be placed on the prosecution. On this question, the Court indulges in what might be called the "straw man" method of adjudication. The Court responds to this suggestion by overinflating the burden. And, when it is suggested that the *prosecution's* burden of proof could be easily satisfied if the police informed the subject of his rights, the Court responds by refusing to require the *police* to make a "detailed" inquiry. *Ante,* at 245. If the Court candidly faced the real

question of allocating the burden of proof, neither of these maneuvers would be available to it.

If the burden is placed on the defendant, all the subject can do is to testify that he did not know of his rights. And I doubt that many trial judges will find for the defendant simply on the basis of that testimony. Precisely because the evidence is very hard to come by, courts have traditionally been reluctant to require a party to prove negatives such as the lack of knowledge. See, *e. g.,* 9 J. Wigmore, Evidence 274 (3d ed. 1940); F. James, Civil Procedure § 7.8 (1965); E. Morgan, Some Problems of Proof Under the Anglo-American System of Litigation 75–76 (1956).

In contrast, there are several ways by which the subject's knowledge of his rights may be shown. The subject may affirmatively demonstrate such knowledge by his responses at the time the search took place, as in *United States* v. *Curiale,* 414 F. 2d 744 (CA2 1969). Where, as in this case, the person giving consent is someone other than the defendant, the prosecution may require him to testify under oath. Denials of knowledge may be disproved by establishing that the subject had, in the recent past, demonstrated his knowledge of his rights, for example, by refusing entry when it was requested by the police. The prior experience or training of the subject might in some cases support an inference that he knew of his right to exclude the police.

The burden on the prosecutor would disappear, of course, if the police, at the time they requested consent to search, also told the subject that he had a right to refuse consent and that his decision to refuse would be respected. The Court's assertions to the contrary notwithstanding, there is nothing impractical about this method of satisfying the prosecution's burden of proof.[11]

---

[11] The proposition rejected in the cases cited by the Court in nn. 13 and 14, was that, as in *Miranda* v. *Arizona,* 384 U. S. 436 (1966),

It must be emphasized that the decision about informing the subject of his rights would lie with the officers seeking consent. If they believed that providing such information would impede their investigation, they might simply ask for consent, taking the risk that at some later date the prosecutor would be unable to prove that the subject knew of his rights or that some other basis for the search existed.

The Court contends that if an officer paused to inform the subject of his rights, the informality of the exchange would be destroyed. I doubt that a simple statement by an officer of an individual's right to refuse consent would do much to alter the informality of the exchange, except to alert the subject to a fact that he surely is entitled to know. It is not without significance that for many years the agents of the Federal Bureau of Investigation have routinely informed subjects of their right to refuse consent, when they request consent to search. Note, Consent Searches: A Reappraisal After Miranda v. Arizona, 67 Col. L. Rev. 130, 143 n. 75 (1967) (citing letter from J. Edgar Hoover). The reported cases in which the police have informed subjects of their right to refuse consent show, also, that the information can be given without disrupting the casual flow of events. See, *e. g.*, *United States* v. *Miller*, 395 F. 2d 116 (CA7 1968). What evidence there is, then, rather strongly suggests that nothing disastrous would happen if the police, before requesting consent, informed the subject that he had

a statement to the subject of his rights must be given as an indispensable prerequisite to a request for consent to search. This case does not require us to address that proposition, for all that is involved here is the contention that the prosecution could satisfy the burden of establishing the knowledge of the right to refuse consent by showing that the police advised the subject of a search, that is sought to be justified by consent, of that right.

a right to refuse consent and that his refusal would be respected.[12]

I must conclude, with some reluctance, that when the Court speaks of practicality, what it really is talking of is the continued ability of the police to capitalize on the ignorance of citizens so as to accomplish by subterfuge what they could not achieve by relying only on the knowing relinquishment of constitutional rights. Of course it would be "practical" for the police to ignore the commands of the Fourth Amendment, if by practicality we mean that more criminals will be apprehended, even though the constitutional rights of innocent people also go by the board. But such a practical advantage is achieved only at the cost of permitting the police to disregard the limitations that the Constitution places on their behavior, a cost that a constitutional democracy cannot long absorb.

I find nothing in the opinion of the Court to dispel my belief that, in such a case, as the Court of Appeals for

---

[12] The Court's suggestion that it would be "unrealistic" to require the officers to make "the detailed type of examination" involved when a court considers whether a defendant has waived a trial right, *ante*, at 245, deserves little comment. The question before us relates to the inquiry to be made in court when the prosecution seeks to establish that consent was given. I therefore do not address the Court's strained argument that one may waive constitutional rights without making a knowing and intentional choice so long as the rights do not relate to the fairness of a criminal trial. I would suggest, however, that that argument is fundamentally inconsistent with the law of unconstitutional conditions. See, *e. g.*, *Perry* v. *Sindermann*, 408 U. S. 593 (1972); *Shapiro* v. *Thompson*, 394 U. S. 618 (1969); *Sherbert* v. *Verner*, 374 U. S. 398 (1963); *Speiser* v. *Randall*, 357 U. S. 513 (1958). The discussion of *United States* v. *Wade*, 388 U. S. 218 (1967), *ante*, at 239–240, also seems inconsistent with the opinion of MR. JUSTICE STEWART in *Kirby* v. *Illinois*, 406 U. S. 682 (1972). In any event, I do not understand how one can relinquish a right without knowing of its existence, and that is the only issue in this case.

the Ninth Circuit said, "[u]nder many circumstances a reasonable person might read an officer's 'May I' as the courteous expression of a demand backed by force of law." 448 F. 2d, at 701. Most cases, in my view, are akin to *Bumper* v. *North Carolina,* 391 U. S. 543 (1968): consent is ordinarily given as acquiescence in an implicit claim of authority to search. Permitting searches in such circumstances, without any assurance at all that the subject of the search knew that, by his consent, he was relinquishing his constitutional rights, is something that I cannot believe is sanctioned by the Constitution.

## III

The proper resolution of this case turns, I believe, on a realistic assessment of the nature of the interchange between citizens and the police, and of the practical import of allocating the burden of proof in one way rather than another. The Court seeks to escape such assessments by escalating its rhetoric to unwarranted heights, but no matter how forceful the adjectives the Court uses, it cannot avoid being judged by how well its image of these interchanges accords with reality. Although the Court says without real elaboration that it "cannot agree," *ante,* at 248, the holding today confines the protection of the Fourth Amendment against searches conducted without probable cause to the sophisticated, the knowledgeable, and, I might add, the few.[13] In the final analysis, the Court now sanctions a game of blindman's buff, in which the police always have the upper hand, for the sake of nothing more than the convenience of

---

[13] The Court's half-hearted defense, that lack of knowledge is to be "taken into account," rings rather hollow, in light of the apparent import of the opinion that even a subject who proves his lack of knowledge may nonetheless have consented "voluntarily," under the Court's peculiar definition of voluntariness.

the police. But the guarantees of the Fourth Amendment were never intended to shrink before such an ephemeral and changeable interest. The Framers of the Fourth Amendment struck the balance against this sort of convenience and in favor of certain basic civil rights. It is not for this Court to restrike that balance because of its own views of the needs of law enforcement officers. I fear that that is the effect of the Court's decision today.

It is regrettable that the obsession with validating searches like that conducted in this case, so evident in the Court's hyperbole, has obscured the Court's vision of how the Fourth Amendment was designed to govern the relationship between police and citizen in our society. I believe that experience and careful reflection show how narrow and inaccurate that vision is, and I respectfully dissent.