MR. JUSTICE SHEEHY
dissenting:
With suitable respect, I read the majority opinion as sidestepping the review required of us under the remand of the United States Supreme Court in the light of Edwards v. Arizona (1981), 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378. The majority opinion seems to be a justification of its earlier opinion, one that the United States Supreme Court has remanded as possibly unjustifiable. Blakney’s confession, says the majority here, was voluntary; ergo, the waiver of counsel by Blakney was knowing and intelligent. I do not agree.
In Edwards, we are reminded that under Schneckloth v. Bustamante (1973), 412 U.S. 218, 246, 93 S.Ct. 2041, 2057, 36 L.Ed.2d 854, 874, the voluntariness of a consent or admission on one hand, and a knowing and intelligent waiver on the other, are discrete inquiries. Edwards, 451 U.S. at 483-84, 101 S.Ct. at 1884, 68 L.Ed.2d at 385-386.
*145 I believe that this case was remanded to us by the United States Supreme Court because this Court, like Arizona in Edwards, had focused on the voluntariness of petitioner’s confession rather than on whether he understood his right to counsel and intelligently and knowingly relinquished it. The majority opinion does nothing to refocus its inquiry, and to shed light on the question for which the case is returned to us by the United States Supreme Court.
The majority base their opinion largely on the findings of fact and conclusions of law of the trial court in its order denying the suppression of Blakney’s confessions. The majority opinion makes no mention of the two glaring flaws in those findings of fact and conclusions of law that were emphasized in the two dissents to the original opinion. See 605 P.2d at 1101-1107. We said in those dissents that the findings were flawed because the District Court applied the burden of proof to Blakney instead of to the State and that this was erroneous. The majority opinion in the first case concluded that the court had indeed applied the wrong rule for burden of proof, but held this to be harmless error. In a legal sense “harmless error” is a black hole in which all matter is at one, and from which no light can be seen.
The other flaw in the trial court’s findings and conclusions is that after the hearing on the motion to suppress, the trial court entered an order denying the suppression. It was following this that an intern working with the county attorney in the case suggested that findings of fact and conclusions of law would be proper. The trial court’s findings and conclusions were entirely prepared by the county attorney, and were entered ex post facto the order denying suppression.
I firmly contend the State failed in its burden of proof to show that Blakney understood his right to counsel and intelligently and knowingly relinquished it, as required under Edwards. A review of the record will show why.
The witnesses in the suppression hearing were placed under the rule and so did not hear each other testify. At the critical time of the request made by Blakney for an attorney, those present were Officers Ibsen and Weaver and Blakney himself.
*146 Officer Ibsen was the first to testify at the suppression hearing. His testimony was (1) Blakney made a request for an attorney after he had first confessed to the act, (2) Blakney did not ask for an attorney before the entire confession had been obtained, and (3) Ibsen was positive of these facts.
“Q. [Blakney’s counsel] Before he made any statement, did he at all attempt to assert his rights to obtain an attorney? A. [Ibsen] At one point, I’m not sure if it was — I believe it was after the first time he had given his confession — he said that he thought he wanted an attorney.
“Q. Now, you think it was after the first time. Are you sure? A. It was after the first confession or during — in the middle of it.
“Q. What I’m interested in finding out from your testimony is when Larry stated that he thinks he better see a lawyer. Are you absolutely sure in your mind that it was after he made his confession, or was it right at the start of it? A. It was after he had started to make his confession, and it may have been, there, too, between the first time and the second time he made that confession.

CC

“Q. But you are positive that it was after the first confession? A. After the first confession was started, or towards the end of it.
“Q. What do you mean by ‘started’? A. After he was well into it.”
Officer Weaver was called to the stand, and his testimony was to the effect (1) that Blakney did not ask for a lawyer, and (2) whatever statement he made was before any confession by Blakney.
“Q. [Blakney’s counsel] At any time subsequent to completing the polygraph examination, did Larry make a statement to the effect that ‘Maybe I should see a lawyer’? A. He made a statement similar to that.
“Q. At that time, did you continue questioning, or did you cease? A. Larry continued to talk.
*147 “Q. Did you allow Larry to leave the room and make a phone call for an attorney? A. He did not ask to.
“A. Did he ask you if he could go talk to his uncle or did you allow him to leave the room and talk to his uncle? A. I didn’t deny him.
“Q. Did you stop your questioning at that point? A. At what point?
“Q. When he said, T think I’d better see a lawyer.’ A. I stopped questioning, yes.
“Q. And yet, subsequent to that, he made a statement; is that correct? A. Would you say it again, sir?
“Q. Okay. Larry stated, ‘Maybe I should see a lawyer’, and you stopped questioning, but, yet, you are saying that he made a statement after that? A. He did not make — he did not ask for an attorney.
“Q. But he said, ‘Maybe I should see one’? A. Yes.
“Q. And you didn’t get him one? A. He did not ask for one, sir.
“Q. That’s not my question, whether or not he asked for one. I’m asking you did you get him a lawyer after he said, ‘Maybe I should see a lawyer’? A. No, sir.
<<
“Q. At what point in time was this request or assertion made? A. I do not recall the exact incident or the exact way it was phrased, and so, that means I don’t recall when it was made in the interview.
“Q. So, then, it could have been made before a statement was given? A. Yes. I’m sure it was.
“Q. You are sure it was made? A. I’m sure of that, yes.” (Emphasis added.)
Blakney was the next to testify. His testimony was (1) he had asked for a lawyer, (2) it was before he had given any statement, and (3) the police just kept talking.
“Q. Then where did the polygraph operator go? A. Then, he left the room.
“Q. Who was in the room with you then? A. Ibsen and Weaver came in.
*148 “Q. Then what happened? A. They started, you know, chumming up to me, and they was saying that, you know, ‘Come on, Larry. We know you did it. You’ve got to tell us.’
“Q. At this time, did you say anything about your constitutional rights? A. Well, I said, ‘Well, I think I better talk to a lawyer.’
“Q. Was this before you had given them any statement? A. Yes.
“Q. What did the police do? A. Just kept talking.
“Q. What did you think that meant? A. That they wasn’t going to get me a lawyer.
“Q. Did you think there was any reason to ask them again? A. Well, I already asked them, you know, and I didn’t want to push anything.”
When the State then presented its case in the suppression hearing, the county attorney recalled Officer Ibsen. At this time, Officer Ibsen (1) repeated that there was request for the attorney, (2) weakened his testimony as to whether it was before the confession had been given, and (3) stated that Blakney said he didn’t want an attorney, (4) after a statement made by Officer Weaver but not testified to by Weaver.
“Q. [County attorney] Officer, was there any mention of this first word about an attorney again that night at all? A. [Ibsen] Yes, sir.
“Q. And when did that occur? A. That occurred a matter of seconds after Mr. Blakney started talking again.
“Q. What was it that he said? A. It was not about — it was not a mention of an attorney that he said, but it was by Officer Weaver.
“Q. Officer Weaver said something about an attorney? A. Yes, sir. He did.
“Q. And what did Officer Weaver say? A. He stopped Mr. Blakney and he advised him that he had just said he thought he wanted an attorney and, you know, he indicated that since he had said that, why was he talking again?
“Q. And what was Mr. Blakney’s response to that? A. Mr. Blakney’s reply — again, it is not a quote. The best of my *149 recollection, the wording of it, T don’t need one’ or T don’t want one.’
“Q. And then what happened? A. Then he continued on.”
The State recalled Officer Weaver again to the stand. By way of explanation, to this point, the evidence in the record indicates that Blakney’s request for an attorney had been made on Monday night, following his polygraph examination. Weaver, on recall testified (1) that a request had been made by the attorney on Sunday morning, and (2) that another request was made on Monday night but he could not recall the events so as to confirm what Ibsen had testified about that request.
“Q. [County attorney] Officer, do you recall, at any time during the course of your dealings with Mr. Blakney, whether he said anything about an attorney? A. Yes, sir.
“Q. And can you tell us what happened or what was said? A. At one point in the interview, the Defendant asked me if — something to the point — I don’t remember the exact words, but the gist of it was, ‘If you think I did it, then maybe I should talk to an attorney.’
“Q. What was your response to this? A. At this time, I got up from where I was sitting, I stood up. I told Larry that — I says, T don’t know what happened, but I believe that you possess some information, and that’s what I’m after.’ If he wanted an attorney, that was his decision, and we would abide by it.
“Q. And what happened after that? A. He just started talking again about what we were asking him questions regarding to.
“Q. Now, when did this particular event occur? A. It occurred about midway through the second interview.
“Q. This would be the interview on Sunday morning? A. Yes.
“Q. Did you have the occasion to talk to the Defendant again where there was anything like that that you can recall? A. I remember the event occurring about the same way on Monday night, but I do not remember the particulars of what happened, like I do the Sunday morning conversation.
*150 “Q. Do you remember anything at all about it? A. All I can remember is that we did stop and the conversation proceeded something as the order of the first one.
“Q. But you don’t recall the exact words that were said? A. No, sir.
“Q. [Blakney’s counsel] Were there any other interviews on Sunday? A. No.
“Q. So he did mention an attorney? A. Yes.
“Q. Now, I think you said that Larry said something to the effect that, Tf you think I did it, maybe I should see an attorney.’ Is that your statement? A. Yes.
“Q. And then, what did you do following that statement? A. As I indicated earlier, I got up from where I was seated, and as I remember, he wanted to know what I thought in this same general área that we are talking about, here.
“Q. About whether he should see an attorney? A. Yes, and what I thought, you know, whether I thought he had done something. And I told him it was his decision, that I was just after some information that I thought he possessed.
“Q. At that point in time, was he a suspect in your eyes? A. No, sir.
<<
“Q. But he did make a request or a mention of an attorney on the Sunday morning interview? A. No request; just a mention, sir.
“Q. Do you remember testifying in this Courtroom on Tuesday. A. Yes, sir.
“Q. About the Monday night incident? A. Yes, sir.
“Q. Do you remember me asking you if, on Monday night, Larry made a mention or request for an attorney? A. As I recall — I am not sure, but as I recall, I referred that incident to the second interview.
“Q. I think that I asked you if, after the polygraph examination, Larry made a reference to an attorney, and you said, ‘Yes.’ And I said, ‘Was that before the first statement was taken?’ And you said, ’Yes.’
“[County attorney] Your Honor, I’ll object on the grounds that this would be proven by the record, and the Court, of *151 course, has heard the testimony, so I think the question is argumentative.
“THE COURT: Sustained.
“[Blakney’s counsel] Your Honor, if I could address that, this is cross examination, and there appears to be a material conflict in this witness’s testimony. We have been recessed for this particular witness over a weekend. Apparently, he has talked to the County Attorney’s office. It’s a possible conspiracy, here, to violate this man’s constitutional rights, and I think that leeway should be granted to find out just what happened.
“THE COURT: I have ruled, and when I want argument, I’ll ask for it. Your next question.
“Q. [Blakney’s counsel] You don’t recall making the statement on Tuesday, then, that the mention of an attorney was before the first statement was taken? A. As I remember my Tuesday testimony, when I referred to the question of an attorney and I gave my explanation as I did today, I was referring to the second statement taken.
“Q. And not to the Monday night incident? A. No. As I testified here today, I remember the Monday night occurrence, but not — I didn’t relate to it.
“Q. Is your testimony, then, that you remember what occurred Monday night after the polygraph examination? A. Pardon me, sir?
“Q. Do you remember what happened after the polygraph on Monday? A. Yes, sir.
“Q. And do you remember — I think you mentioned on direct examination that you don’t recall the exact words that were used by Larry in reference to an attorney; is that correct? A. On Monday night, I do not.
“Q. But now, you are saying that the request or mention came some time after the first statement was started? A. I recall the incident of what the conversation was saying during the second statement, and not the Monday night statement.
“Q. Do you recall at this time whether or not, on Monday night, Larry made mention of an attorney either before the *152 first statement began, during the first statement, or some time after? A. On Monday night?
“Q. Yes. A. I recall an incident occurring; I do not recall what occurred.
“Q. Do you recall when it occurred? A. It occurred while we were talking to Larry.
“Q. Before or after a statement was given. A. I do not recall when it was given.”
Blakney was recalled to the stand respecting the Sunday morning incident testified to by Weaver and testified:
“[County attorney] Mr. Volinkaty asked you something about some attorney on a Sunday morning interview, and you said something about something — something an attorney. A. On Sunday?
“Q. Yes, Sunday morning. The one between — oh, I don’t know — nine and twelve which Officer Weaver testified about. A. That I asked for an attorney?
“Q. Yes. A. No, I didn’t.
“Q. You didn’t ask for an attorney? A. Not on Sunday. I asked on Monday.
“Q. So what Officer Weaver testified about wasn’t true, in your opinion? A. No, it wasn’t.”
Based on that testimony, I determine that the findings of the trial court were clearly erroneous. I find it incredible that Blakney requested counsel at the Sunday morning interview, when he was not apparently under suspicion for the crime. I find it incredible that he said he “didn’t want an attorney” at the Monday night interview, when the person to whom it is claimed he made that statement has no recollection of it at all. I further believe that when Blakney stated he wanted an attorney, he was cajoled by the interrogating officer that all they wanted was “some information that he possessed.”
A further indication of the unreliability of the trial court’s findings is no. 6, which stated that “a tape recording of the defendant’s polygraph examination clearly indicates that the defendant was not threatened or intimidated by the procedures used.” There was no tape recording of that particular examination.
*153 The State failed in its burden to show that Blakney intelligently and knowingly relinquished his right to counsel, or that he understood his right to counsel. Under Edwards, I would vacate his conviction, and remand with instructions to suppress the evidence of his confessions.
MR. JUSTICES SHEA and MORRISON concur in the foregoing dissent.