**SECOND DIVISION**
**BARNES, P. J.,**
**BOGGS and RICKMAN, JJ.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**May 11, 2016**

# In the Court of Appeals of Georgia

A16A0339. THE STATE v. FLORES-GALLEGOS.                    BO-011C

BOGGS, Judge.

The State of Georgia appeals from the trial court's order suppressing Mario Flores-Gallegos' intoxilyzer test results. The court concluded that Flores-Gallegos "did not give actual, knowing and voluntary consent to the administration of the State's breath test." For the following reasons, we remand this case for the trial court to consider the motion to suppress under the proper standard.

When reviewing the trial court's ruling on a motion to suppress, this court applies the following principles:

> First, when a motion to suppress is heard by the trial judge, that judge sits as the trier of facts. The trial judge hears the evidence, and his findings based upon conflicting evidence are analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any

evidence to support them. Second, the trial court's decision with regard to questions of fact and credibility must be accepted unless clearly erroneous. Third, the reviewing court must construe the evidence most favorably to the upholding of the trial court's findings and judgment.

(Citation and punctuation omitted.) *State v. Barnes*, 331 Ga. App. 631, 632 (770 SE2d 890) (2015). To this end, "we owe no deference to the trial court's conclusions of law and are instead free to apply anew the legal principles to the facts." (Citation and punctuation omitted.) Id. We "review de novo the court's application of the law to the undisputed facts." (Citation, punctuation and footnotes omitted.) *State v. Mosley*, 321 Ga. App. 236 (739 SE2d 106) (2013).

In this case, the trial court ruled based upon the testimony of the witness whose vehicle Flores-Gallegos rear-ended, the officer on the scene of the accident, and the officer at the police precinct who administered the breath test. The officer on the scene testified that the first thing he noticed upon speaking with Flores-Gallegos "was a smell of alcohol. It wasn't overly strong, but when I stood close to him, I could smell it coming off his breath." This officer observed that Flores-Gallegos "had an accent. His speech was slow, a little thick, like he had a hard time getting words out . . . He was speaking English, but he had an accent, as if his native language was Spanish." After Flores-Gallegos told the officer he had been drinking that day but had

2

his last drink an "hour-and-a-half prior to this incident," the officer asked Flores-Gallegos to perform field sobriety tests. The officer explained that Flores-Gallegos was able to give him responsive answers to questions and stated in English that he was unable to complete the walk-and-turn test in its entirety. On cross-examination, the officer testified that Flores-Gallegos took 12 steps on the "walk-and-turn" evaluation instead of 9 as the officer had instructed.

The officer arrested Flores-Gallegos based upon his performance on the field sobriety evaluations, unsteadiness on his feet, smell of alcohol, and positive alcosensor reading. The officer read the implied consent warning to Flores-Gallegos in English while he was seated in the back of the officer's patrol car. When the officer asked Flores-Gallegos for a breath test pursuant to the warning, Flores-Gallegos responded, "No English." The officer found this response to be "unusual" because "during the entire encounter [Flores-Gallegos] was speaking English to [him]." He explained further that at no point during the 30 to 40 minute encounter did Flores-Gallegos ever indicate that he had trouble understanding him.

The officer transported Flores-Gallegos to the police precinct where he again read him the implied consent warning, after which a second officer "presented the test to him for - - if he'd like to take it." Flores-Gallegos nodded and gave two breath

samples while still handcuffed. The first officer explained that Flores-Gallegos "was asked if he wanted to obey implied consent, again, . . . and based upon that, he ended up blowing." He could not recall whether Flores-Gallegos was seated or standing or whether the second officer put the tube in his mouth.

The second officer testified that he conducted the intoxilyzer test at the police precinct, and that he did not recall the first officer reading Flores-Gallegos the implied consent notice: "[Flores-Gallegos] stood up under his own power and walked over. As to whether he had said yes or no, that was - - [the first officer] had said that he needed the Intoxilyzer run."

Under these facts, Flores-Gallegos was charged with DUI less-safe, DUI unlawful alcohol concentration, and following too closely. He moved to suppress all evidence gathered at the scene, but the trial court granted the motion only with respect to the intoxilyzer testing and results. The court ruled:

> In this case, after the arresting officer read him the implied consent notice, the defendant said, "no English," indicating that he did not understand the notice. Law enforcement personnel made no further efforts to gain the defendant's actual and voluntary consent, other than placing him in front of the Intoxilyzer and instructing him to blow. The State argued that the defendant understood English because the arresting

4

officer conducted his pre-arrest investigation in English and the defendant complied with the officer's requests throughout.

The Court finds that the defendant's pre-arrest conduct did not establish that the defendant sufficiently understood English to allow him to understand the consequences of refusing to take the State's test or that he had the option to refuse. The command of English required by the defendant to respond to the officer's simple questions (aided by gestures) and to attempt to imitate the officer' demonstrations of the field sobriety tests, does not necessarily indicate that he possessed the ability to understand the mandated implied consent notice. Rather, taking into account the totality of the circumstances and the entirety of the transactions between the defendant and law enforcement personnel, the Court finds that the State showed no more than that the defendant acquiesced to the officers' claims of lawful authority. Thus, under *Williams v. State*, [296 Ga. 817 (771 SE2d 373) (2015)], the Court is constrained to find that the defendant did not give actual, knowing and voluntary consent to the administration for the State's breath test.

WHEREFORE, Defendant's Motion to Suppress is hereby granted as to the Intoxilyzer testing and the results thereof.

"Because a breath test is a search within the meaning of the Fourth Amendment, absent a warrant, the State must show that it falls into one of the 'specifically established and well-delineated exceptions' to the warrant requirement."

(Citation omitted.) *Kendrick v. State*, 335 Ga. App. 766, 768 (Case No. A15A2111; decided February 23, 2016). The analysis in this case therefore must focus on the voluntary consent exception to the warrant requirement. *Williams*, supra, 296 Ga. at 821. In *Schneckloth v. Bustamonte*, 412 U. S. 218 (93 SCt 2041, 36 LEd 2d 854) (1973), the Supreme Court of the United States addressed at length what the prosecution must "prove to demonstrate that a consent [to search] was 'voluntarily' given." Id. at 223. Accordingly, when the State relies upon the consent exception to the warrant requirement, "[i]t has the burden of proving that the accused acted freely and voluntarily under the totality of the circumstances." (Citations, punctuation and footnote omitted.) *Williams*, supra, 296 Ga. at 821-822.

This court has noted that

A "totality of the circumstances" analysis is not new to Georgia courts. "A consent to search will normally be held voluntary if the totality of the circumstances fails to show that the officers used fear, intimidation, threat of physical punishment, or lengthy detention to obtain the consent." *Cuaresma v. State*, 292 Ga. App. 43, 47 (2) (663 SE2d 396) (2008). Nor may consent be "coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth v. Bustamonte*, 412 U.S. 218 228 (II) (B) (93 SCt 2041, 36 LEd 2d 854) (1973). Other factors to be considered are "prolonged questioning; . . . the accused's age, level of education, intelligence . . . and advisement of constitutional rights; and

6

the psychological impact of these factors on the accused." *State v. Austin*, 310 Ga. App. 814, 818 (1) (714 SE2d 671) (2011). Moreover, "[w]hile knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent." *Schneckloth*, 412 U. S. at 227 (II) (B). Instead, the court should consider whether "a reasonable person would feel free to decline the officers' request to search or otherwise terminate the encounter." *Austin*, 310 Ga. App. at 820 (1) (citing *Johnson v. State*, 297 Ga. App. 847, 849 (678 SE2d 539) (2009)); *State v. Durrence*, 295 Ga. App. 216, 218 (671 SE2d 261) (2008). "Mere acquiescence to the authority asserted by a police officer cannot substitute for free consent." *State v. Jourdan*, 264 Ga. App. 118, 121 (1) (589 SE2d 682) (2003) (internal citation omitted); *Hollenback v. State*, 289 Ga. App. 516, 519 (657 SE2d 884) (2008).

*Kendrick*, supra, 335 Ga. App. at 769.

Here, the trial court concluded that Flores-Gallegos did not give "actual, knowing and voluntary consent" to have his breath tested by considering whether he understood the implied consent notice and the consequences of refusing the take the test. But "knowing consent" is not required under our law. The State must show only that the accused acted "freely and voluntarily" in giving "actual consent." *Williams*, supra, 296 Ga. at 821-822. While the trial court considered the totality of the circumstances in concluding that Flores-Gallegos acquiesced to the breath test, as

7

*Williams* instructs, it did so by employing an improper standard. Id. at 822. We therefore vacate the trial court's judgment and remand this case for the court to consider Flores-Gallegos' motion to suppress under the proper standard.

*Judgment vacated and case remanded with direction. Barnes, P. J., and Rickman, J., concur.*